## THE LEONIDAS.
### No. 2396.

District Court, D. Maryland.

April 11, 1940.

Sol C. Berenholtz, of Baltimore, Md., for libelants.

Southgate L. Morison, of Baltimore, Md. (Ritchie, Janney, Ober & Williams, of Baltimore, Md., of counsel), for respondent.

CHESNUT, District Judge.

The libelants in this case are five Greek seamen who, on January 8, 1940, shipped on the Greek steamer "Leonidas" from Philadelphia, Pennsylvania, on a voyage to Ireland and return to a port in the United States. The wages for which they contracted were at the rate of about £7 per month, and in addition a war bonus "by the Greek law". Shortly before embarking at Philadelphia these seamen were in Baltimore, having recently theretofore landed from another Greek ship, and being without employment they applied to the Chancellor of the Greek Legation at Washington, who was also acting as Greek Consul for Baltimore, to secure for them employment; and he succeeded in obtaining it for them on the Leonidas. He explained to them that as the Leonidas was going into the belligerent war zone they would be entitled, in addition to their wages, to a bonus as fixed and determined and payable in accordance with the Greek law. It was also explained to them that this bonus would be at the rate of 80% of their wages during the voyage until the belligerent zone was entered and a further sum of about £1 per day while actually in the belligerent zone; and it was further explained to them that by the Greek law this war bonus would not be payable directly to them but would be forwarded at the conclusion of each trip by check for their account to the Bank of Greece. When the vessel reached Dublin, Ireland, the master sent the amount of the war bonus to which each of the libelants was entitled to the Bank of Greece for their account, and so informed them.

Upon the return of the ship to Baltimore, the libelants were discharged and paid their wages in full, but in addition demanded that the war bonus accruing on account of the return voyage from Dublin should also be paid directly to them here at Baltimore. This the master refused to do; and the libelants promptly filed a libel against the ship in this court on March 8, 1940. There is no dispute as to the amount of the war bonus payable in accordance with the Greek law for the account of each of the libelants, the amount being stated in the shipowner's answer for the seamen respectively, averaging about £11 for each.

At the trial the above recited facts were clearly established by the testimony and the provisions of the Greek law with respect to the method of payment of the war bonus were clearly and definitely testified to by the master of the ship and his first officer and also by the Chancellor of the Greek Legation in Washington. An authentic translated copy of the applicable departmental order, having the force of law, was filed as evidence.

On behalf of the shipowner it is first urged that this court is without jurisdiction to entertain the libel by reason of this government's treaty with Greece in the Convention of November 1902, 33 Stat. 2122. Art. 12 of that Convention reads as follows:

"Consuls-general, consuls, vice-consuls and consular agents shall have exclusive charge of the internal order of the merchant vessels of their nation and shall alone take cognizance of differences which may arise either at sea or in port between the captains, officers and crews, without exception, particularly in reference to the adjustment of wages and the execution of contracts. In case any disorder should happen on board of vessels of either party, in the territory or waters of the other, neither the Federal, State or Municipal Authorities or Courts in the United States, nor any Court or Authority in Greece, shall on any pretext interfere except when the said disorders are of such a nature as to cause or to be likely to cause a breach of the peace or serious trouble in the port or on shore; or when, in such trouble or breach of the peace, a person or persons shall be implicated, not forming a part of the crew."

In the Cambitsis, D.C.Pa.; 1926, 14 F. 2d 236, the court dismissed for lack of jurisdiction a libel for wages against a Greek steamer by reason of this Convention. See, also, Athanasios Veziris v. SS Taxiarchis (D.C.N.Y.) 1940 A.M.C. 318, December 21, 1939; in which case, as in this, the libel was brought to recover the Greek war bonus, but the court declined to take jurisdiction, the shipowner having set up the same Treaty of 1902.

Counsel for the libelants contend that this Treaty was abrogated by the United States, so far as the present case is concerned, by action taken by our State De-

partment in 1916, in accordance with section 16 of the well-known Seamen's Act of 1915, Ch. 153, 38 Stat. 1164, 1184, 22 U.S.C.A. § 258. Apparently no such contention was made or considered by the courts in the above cases. Whether the Convention of 1902 with Greece has been abrogated with respect to the exclusive jurisdiction of the Greek Consul to determine the controversy in this case, does not admit of a simple and short categorical answer. The relevant data brought to my attention by counsel or otherwise discovered is as follows: Section 16 of the Seamen's Act provided—

"That in the judgment of Congress articles in treaties and conventions of the United States, in so far as they provide * * * * for the arrest and imprisonment of officers and seamen deserting or charged with desertion from merchant vessels of foreign nations in the United States and the Territories and possessions thereof, and for the cooperation, aid, and protection of competent legal authorities in effecting such arrest or imprisonment *and any other treaty provision in conflict with the provisions of this Act,* ought to be terminated, and to this end the President be, and he is hereby, requested and directed, within ninety days after the passage of this Act, to give notice to the several Governments, respectively, that so much as hereinbefore described of all such treaties and conventions between the United States and foreign Governments will terminate on the expiration of such periods after notices have been given as may be required in such treaties and conventions." (Italics supplied)

It will be noted that the arrest and imprisonment of seamen for desertion is the only subject matter of the Seamen's Act which is specifically mentioned as in conflict with earlier Treaties; and in this connection it may also be noted that the title of the Act is—"An Act To promote the welfare of American seamen in the merchant marine of the United States; to abolish arrest and imprisonment as a penalty for desertion and to secure the abrogation of treaty provisions in relation thereto; and to promote safety at sea." Pursuant to the provisions of section 16 of the Seamen's Act the Secretary of State requested the Hellenic Government to abrogate Articles 12 and 13 of the Consular Convention of November 19, 1902; and in reply the Government of Greece on May 7, 1916 expressed its willingness—"to consider, therefore, as being abrogated the special provisions of Articles 12 and 13 of the Convention of 1902 *as far as they are in opposition to the new American legislation.* It is well understood that all other provisions contained in the said Articles 12 and 13, notably everything that concerns the arrest, detention and imprisonment of deserters from the Greek Navy in the ports and waters of the United States, will continue to remain in force on the same basis and with the same validity as the other Articles of the Convention of 1902". (Italics supplied)

It will be noted that as a result of this diplomatic correspondence Article 12 of the Treaty was not absolutely and entirely abrogated but only insofar as it was in conflict with the Seamen's Act. See Foreign Relations of the United States, 1916, pages 41, 42. In the case of Van Der Weyde v. Ocean Transport Co., 297 U.S. 114, 56 S.Ct. 392, 80 L.Ed. 515, the Supreme Court, in dealing with a kindred subject matter, held that Article 13 of the Treaty of Commerce and Navigation of 1827 between the United States and the Kingdom of Sweden and Norway, which provided for the exclusive jurisdiction of Consuls to determine controversies arising between the captains and crews of vessels had been abrogated by the United States by the diplomatic correspondence in that case. See Foreign Relations of the United States, 1919, pages 50 to 52. But an examination of the latter official correspondence shows that the particular Articles of the Treaty were entirely abrogated without qualification. It may also be observed that in similar official correspondence on the abrogation of treaties with other countries, by virtue of the passage of the Seamen's Act, the thing that is particularly stressed is the provision of the Act with regard to arrest and imprisonment of seamen for desertion. See Foreign Relations of the United States, 1915 at pages 6, 7, 8; 1916 at page 37; 1917 at pages 14 to 17; 1919 at pages 53, 71. It may also be relevant to note that subsequent to the passage of the Seamen's Act a number of treaties or conventions have been made apparently giving jurisdiction to Consuls concurrent with our admiralty courts in controversies between alien masters and seamen. See The Estrella, 3 Cir., 102 F.2d 736;

Van Der Weyde v. Ocean Transport Co., 297 U.S. 114, 117, 56 S.Ct. 392, 80 L.Ed. 515.

█ In this case counsel for the libelants contend that the provisions of the Seamen's Act with regard to payment of wages to foreign seamen on foreign ships in ports of the United States, which are to be found in sections 596, 597 and 599 of Title 46 U.S.C.A., are necessarily in conflict with the provisions of Article 12 of the Greek Treaty of 1902 insofar as it purports to give exclusive jurisdiction to the Greek Consul here to determine the controversy involved in this case. Section 597 which was derived from section 4 of the Seamen's Act of 1915 (as amended June 5, 1920, ch. 250, § 31, 41 Stat. 1006) provides that seamen on vessels of the United States shall be entitled to receive "the remainder of the wages which shall be then due * * * as provided in the preceding section * * when the voyage is ended;" and "that this section shall apply to seamen on foreign vessels while in harbors of the United States, and the courts of the United States shall be open to such seamen for its enforcement." It will be noted that the reference to the preceding section (596) is to determine what is the "remainder" of the wages *then due* to the seamen. By section 596 it is provided that the wages shall be due, in the case of vessels making foreign voyages, "within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens", and upon failure to so pay without sufficient cause the master or shipowner is required to pay to the seamen a sum equal to two days' pay for each and every day during which payment is delayed. In Strathearn S. S. Co. v. Dillon, 252 U.S. 348, 40 S.Ct. 350, 64 L.Ed. 607, it was determined that foreign seamen on foreign vessels in ports of the United States are entitled to the benefits of section 4 of the Seamen's Act as well as American seamen on such vessels. From the decision in that case, and the judicial reasoning in reaching the decision, it seems logically to follow that the provision of Article 12 of the Greek Treaty which gives exclusive jurisdiction to the Greek Consul with respect to wages in such a situation, is inconsistent with the provisions of section 4 of the Seamen's Act, to the extent that the admiralty

courts of the United States must have *concurrent* jurisdiction with the Greek Consul, because it is expressly provided in 46 U.S.C.A. § 597 that the courts of the United States shall be open to foreign seamen to obtain their wages as therein provided. See The Estrella, 3 Cir. 102 F.2d 736.

█ Counsel for the shipowner also contends that even if the court does have jurisdiction it should not be exercised in this case as it is said to be discretionary and not mandatory. Apart from statute or treaty it has long been the well settled admiralty law of this country that the exercise of jurisdiction in controversies between alien seamen and the master of a foreign ship with respect to both matters of contract and tort is in the sound legal discretion of the trial judge. Canada Malting Co. v. Paterson Steamships, 285 U.S. 413, 52 S.Ct. 413, 76 L.Ed. 837; The Belgenland, 114 U.S. 355, 5 S.Ct. 860, 29 L.Ed. 152; Heredia v. Davies, 4 Cir. 12 F.2d 500; The Sonderborg, 4 Cir. 47 F.2d 723; Simpson v. Hamburg-American Line, 1939 A.M.C. 1469; The Ester, D. C.S.C., 190 F. 216; Van Der Weyde v. Ocean Transport Co., 9 Cir., 73 F.2d 922, reversed on another point 297 U.S. 114, 56 S. Ct. 392, 80 L.Ed. 515; The Paula, 2 Cir., 91 F.2d 1001; Robinson on Admiralty, p. 20. In the Canada case, supra, Mr. Justice Brandeis, speaking for the Supreme Court, said at page 421 of 285 U.S., 52 S.Ct. at page 415, 76 L.Ed. 837:

"The rule recognizing an unqualified discretion to decline jurisdiction in suits in admiralty between foreigners appears to be supported by an unbroken line of decisions in the lower federal courts. The question has most frequently been presented in suits by foreign seamen against masters or owners of foreign vessels, relating to claims for wages and like differences, or to claims of personal injury. Although such cases are ordinarily decided according to the foreign law, they often concern causes of action arising within the territorial jurisdiction of the United States. Compare Patterson v. The Eudora, 190 U.S. 169, 23 S.Ct. 821, 47 L.Ed. 1002; The Kestor (D.C.) 110 F. 432, 450. Neither in these, nor in other cases, has the bare circumstance of where the cause of action arose been treated as determinative of the power of the court to exercise discretion whether to take jurisdiction."

In this Fourth Circuit it is said that the jurisdiction should be exercised where it is necessary to do so "to prevent a failure of justice, or when the rights of the parties would be thereby best promoted." The Eir, 4 Cir., 60 F.2d 124; Heredia v. Davies, 4 Cir., 12 F.2d 500. In two very recent cases involving claims of foreign seamen against a foreign ship for war bonus, district courts have declined to assume jurisdiction. The Prince Pavle, D.C.E.D.N.Y., March 12, 1940, 32 F.Supp. 5; Athanosios Veziris v. S. S. Taxiarchis, 1940 A.M.C. 318. See, also, The Estrella, 3 Cir., 102 F.2d 736.

■ Unless the war bonus here sued for can properly be regarded as "wages" within the fair import of Title 46 U.S.C.A. § 597, there are cogent reasons why jurisdiction in this case should not be exercised. The parties to the case are all aliens and subjects of Greece; and the agreement for the bonus was expressly made in accordance with the Greek law. Ordinarily, and in the absence of a controlling statute to the contrary, the rights and duties of a seaman on a foreign ship are determined by the law of the flag of the ship. Rainey v. New York & P. S. S. Co., 9 Cir., 216 F. 449, 454, L.R.A.1916A, 1149; The Hanna Nielsen, 2 Cir. 273 F. 171. The ordinary wages have been fully paid to all of the libelants. The amount of the bonus to which each became entitled upon the voyage from Philadelphia to Dublin has been forwarded for his account to the Bank of Greece; and the master of the ship was ready, willing and able to similarly forward to the Bank of Greece the bonus earned by the seamen on the return trip to Baltimore. It was only the filing of the libel in this case which has postponed that action on his part. There are no circumstances in this case of hardship or injustice or arbitrary and unreasonable conduct on the part of the master or shipowner toward the seamen. They are only being held to an agreement which they knowingly and understandingly made. And to require the master to pay the bonus here contrary to the Greek law might possibly not relieve him from further liability under the law of his country.

■ Upon consideration, it is my opinion that the war bonus contracted for in this case does not constitute "Wages" within the meaning of the Seamen's Act. Of course this bonus was not in the nature of a mere gratuity (see Kenicott v. The Supervisors, 16 Wall. 452, 471, 21 L.Ed. 319; Fuller Co. v. Brown, 4 Cir., 15 F.2d 672, 676), and in a certain sense the bonus could be said to be additional wages for extra hazardous services. But I do not think it should be regarded as "wages" within the meaning of that term in the Seamen's Act when the underlying philosophy for the passage of the Act is considered. The object was to secure for seamen the payment of a definite sum, agreed upon in ordinary course of events, upon the termination of their service. To this end it was provided in section 11 of the Seamen's Act, 46 U.S.C.A. § 599, that advance wages should not be paid to seamen, and that allotments of their wages to be made by them should not be valid except under particular conditions. There is no sufficient reason to think that the term "wages" as used in the statute was intended to apply to the war bonus in this case. The meaning of the word "bonus" varies with the context in which it is used. See 11 C.J.S., Bonus, p. 515. Apparently the only reported case in which the term has been legally construed in a situation analogous to the present is The Jacob Luckenbach, D.C.La., 36 F.2d 381. In that case a ship became unseaworthy on a voyage from San Francisco to New Orleans, and the crew were persuaded to proceed on the voyage only on the promise of $100 to each of them as a bonus in addition to the ordinary wages. On the safe arrival of the ship at New Orleans the men were offered their wages to date but payment of the bonus was refused for an insufficient reason. They then libeled the ship for the payment of the bonus and for double "wages" under section 596 of Title 46 U.S.C.A. for failure to pay the bonus as wages. In denying this demand for double wages the Court said, 36 F.2d on page 385:

"It is clear that this statute applies only to 'wages.' The wages of the crew were the monthly payments designated in the articles, and these were paid in full. This being a penal statute, it must be strictly construed, and, when so construed, can have no application to a bonus, which is a word of fixed and determinate meaning, and in no sense synonymous with the word 'wages.' Petterson v. United States (D.C.) 274 F. 1000; Kenicott v. Wayne County, 16 Wall. 452, 21 L.Ed. 319."

It is also urged by counsel for the libelants that the effect of the Greek law for the war bonus is that the seamen must make an allotment of the amount payable contrary to the provisions of section 599 of Title 46 U.S.C.A. This does not seem to be the case. The Greek Departmental Order filed in the case reads as follows:

"Immediately after the conclusion of the trip for which a bonus is granted, as above, the captain must make a report of all the Greek members of his crew. Said report shall contain the full name, rank or specialty, and number of the marine card of the seaman, the amount of the war bonus, and the name and address of the recipient in Greece. Said report must be signed by the captain making the same. The recipient may be a member of the seaman's family or any one else in Greece. The money may also be deposited in any Postal Savings account or in an account in a recognized Bank in Greece. The report must be drawn in triplicate and filed with the local Consular Service, together with a check drawn by the captain for the full amount of the war bonus due and made payable to the Bank of Greece. The currency with which the check is to be paid must be unrestricted and freely exchangeable. * * * The Captain, on the basis of the report returned to him, must give a receipt to the crew, indicating thereon that the check was delivered, the name of the Consulate where it was delivered, and the manner of its transmission to Greece."

From this it does not appear that it is obligatory to make the amount of the bonus payable to some one other than the seaman himself; and the testimony of the master of the ship was that the amount could be made payable to the seamen in Greece. The underlying purpose of the Greek law seems to have been two-fold: (1) to encourage thrift on the part of seamen with respect to this unusual and comparatively large extra compensation over and above ordinary wages, and (2) also to provide for the use of the extra payments in Greece and not in other countries. It does not seem to me that the Greek law in this respect should be considered contrary to the policy of the Seamen's Act.

There is also this further consideration. Clearly the arrangement for the bonus was extra payment for hazardous services, but with the definite provision clearly understood and agreed to by the seamen that the method and place of payment should be as stipulated by the Greek law. There is nothing in the Seamen's Act to provide for a minimum or any definite rate of wages; and if the seamen voluntarily contract for a particular rate of wages, there is no basis in the Act for requiring the payment of a higher or greater sum. The position taken by the libelants here is to accept all the benefits of the arrangement as to the war bonus, but to repudiate the conditions on which it was alone payable. Under the language of section 597 the seamen are only entitled at the end of their voyage to the remainder of wages which shall be then due them. Under the contract made by them in this case they were paid all the wages which were due them in Baltimore upon their discharge. The war bonus was not then due and payable to them here. To sustain their position here would require in effect the making of a new and different contract. I do not think the policy of our statutes justifies this under the circumstances of the case. Nor was the agreement for the payment of the bonus within the mischief intended to be prevented by the Seamen's Act.

I conclude, therefore, that even if jurisdiction be assumed the libel would nevertheless have to be dismissed on the merits. On consideration of the whole case the order will be that jurisdiction will be declined. It is believed that the facts stated in this opinion will be sufficient compliance with the applicable rule as to findings of fact, but if counsel desire more specific and formal findings they may be submitted for consideration.