**THE AUSTVARD.**

No. 2432.

District Court, D. Maryland.

Aug. 12, 1940.

432

I. Duke Avnet, of Baltimore, Md., for libelants.

George Forbes and Henry L. Wortche, both of Baltimore, Md., for respondent.

## CHESNUT, District Judge.

This case presents a controversy as to seamens' wages. The motorship Austvard, of Norwegian ownership and registry, arrived at the Port of Baltimore on July 21, 1940. Since then she has been loaded with a cargo of scrap iron destined for some port. in or near England, and is now undergoing certain repairs before beginning the outward voyage. On August 2, 1940, the libelants, constituting nine members of her crew, on the voyage to Baltimore from Limerick, Ireland, and Swansea, England, filed their libel alleging in effect, for reasons stated, that their period of service terminated and that they had demanded full wages then due to them which had been wrongfully refused by the master of the vessel. On August 3, 1940, the master appearing specially filed a motion "that this court should decline jurisdiction over this cause, for the reason that it is a suit between members of the crew of a Norwegian vessel and said vessel regarding their wages, war bonus, and a breach of contract." This matter was set for hearing on August 6th and at that time counsel for the libelants requested leave to file an amended libel which differs from the original libel substantially only in the added contention that the libelants had subsequently demanded one-half wages, under the provisions of Title 46, United States Code, § 597, 46 U.S.C.A. § 597, which had also been refused, in consequence of which they were entitled to their whole wages then due and double wages for delay in payment.

The respondent's motion to decline jurisdiction is opposed by the libelants. In order to enable the court to advisedly rule on that question, testimony was submitted by the respective parties and at the conclusion thereof counsel on both sides agreed that all the available and relevant evidence having been submitted on the merits of the case as well as on the motion, the court should decide the case on the merits if it decided to assume jurisdiction. This conclusion of counsel was reached in open court despite the fact that the respondent had not answered on the merits either the original or amended bill.

From the testimony I find the following facts: All but two of the libelants entered into Seamens Articles with the master of the Austvard at the Norwegian port of Kristiansand, on or about December 28, 1939. They are citizens of Norway. The libelants Holger Hansen and Tage Pedersen, citizens of Denmark, joined the ship under similar articles at Limerick, Ireland, on June 26, 1940. The period of service contracted for by the seven Norwegian seamen was for 18 months; and for the two Danish seamen, 6 months. The compensation of all was to be "as per tariff with Norwegian Seamens Union". Two special clauses of the Articles provided that the seamen "must enter as member of Norwegian Seamens Union" and "disputes as to understanding of the present agreement shall be provisionally settled by a Norwegian Consul, and shall not, in a foreign country, be brought up before any foreign authorities".

On leaving Kristiansand the ship proceeded to a port in Sweden where it was loaded with pulp wood, and from there went to Portland, Maine, and Boston, Massachusetts, and then to Buenos Aires, Argentine, and from there to join a convoy on the west coast of Africa whence it proceeded first to Limerick, Ireland, and then to Swansea on the west coast of England, and thence by convoy for several days to Baltimore where the ship arrived July 21st. Tage Pedersen who joined the ship at Limerick, Ireland, is the only one of the nine libelants who speaks English, and, to some extent, has been their representative in the present controversy. The voyage from Swansea, England, to Baltimore occupied about 14 days. When the vessel was about 7 days out from Baltimore, some or all of the

libelants notified the master that they desired to terminate their employment when the ship reached a port in the United States; but the master told them that they were not justified in doing so. Before the vessel had arrived at Baltimore on July 21st, the master, as customary, had been presented with a written statement from the chief officer of the amounts of money on account of wages that the several members of the crew desired to have advanced to them. Most of the libelants requested the whole of their wages then accrued up to July 21st. In addition to their ordinary wages the crew was also entitled, in accordance with the tariff of the Norwegian Seamens Union, to a so-called war bonus. On July 22nd, the master paid to all members of the crew the amounts due them for wages (other than bonus) up to July 15th, or the lesser amounts asked for by members of the crew respectively; and had made arrangements to pay them considerable additional sums on account of bonus the next day. He, however, did not pay any of the members of the crew the full amount due them for wages up to July 21st. Thereupon the nine libelants refused further to perform their respective duties as members of the crew and in effect deserted the ship. Upon their renewed demand for full payment to date the captain referred them to the Norwegian Consul at Baltimore who decided that they were not entitled then to further payment of wages or bonus. Nevertheless the libelants continued their refusal to work and went on what is called a "sit-down strike". In their original libel the libelants took the position that under the applicable Norwegian law they were entitled to be discharged because it appeared, after their engagement, there became danger of the vessel being seized by a belligerent power or exposed to war danger, or that such danger had materially increased, and they were entitled to a like discharge when they had been ill-treated by the master. In their libel they alleged that since the respective times of their joining the ship these conditions have occurred and justified their terminating their employment.

At the trial evidence was offered without objection that the applicable Norwegian law reads as follows:

"If it appears after the engagement that a malignant epidemic disease has broken out in the port of destination of the vessel, the seaman shall be entitled to take his discharge—forthwith if the voyage has not yet begun, or otherwise at the first port where the vessel calls after the seaman has become aware of the circumstance in question. His wages shall be paid in such case up to the time of his leaving his employment.

"The same provisions shall apply when it appears after the engagement that there is danger of the vessel's being seized by belligerent power or exposed to war damage, or that such danger has been materially increased.

"If a seaman shows that he has been ill-treated by the captain, or ill-treated by others on board without receiving from the captain the protection appealed for, or that the captain has failed to provide him with proper food, he shall be entitled to take his discharge and to receive his wages and a free passage, with maintenance, in accordance with the provisions of section 34."

In support of the motion to deny jurisdiction the respondent refers to Article 22 of the Treaty (1929) between the United States and Norway which provides as follows: "A consular officer shall have exclusive jurisdiction over controversies arising out of the internal order of private vessels of his country, and shall alone exercise jurisdiction in cases wherever arising, between officers, and crews, pertaining to the enforcement of discipline on board, provided the vessel and the persons charged with wrongdoing shall have entered a port within his consular district. Such an officer shall also have jurisdiction over issues concerning the adjustment of wages and the execution of contracts relating thereto provided, however, that such jurisdiction shall not exclude the jurisdiction conferred on local authorities under existing or future laws."

From this it appears that the Norwegian Consul had exclusive jurisdiction of matters affecting the internal order of the ship with respect to the enforcement of discipline on board; but this court has concurrent jurisdiction with the Consul concerning the adjustment of wages and the execution of contracts relating thereto. The respondent also refers to the fact that in the particular case the libelants first sought the exercise of jurisdic-

tion in the matter by the Consul who decided against them; and attention is also called to the special provision of the Articles that disputes should be provisionally settled by the Norwegian Consul and shall not in a foreign country be brought up before any foreign authorities.

A case involving a similar but not identical situation was recently considered in this court in the case of The Leonidas, D.C., 32 F.Supp. 738, now pending on appeal. In the latter case, which related to a Greek ship, the court, for the reasons therein stated, declined to assume jurisdiction. As a matter of general policy there are strong reasons for declining jurisdiction in ordinary wage controversies between foreign seamen and a vessel of their own nationality; and it would seem generally preferable in such cases to leave the matter to the jurisdiction of the foreign consul. One practical reason is that it is often difficult and inconvenient for an American court to thoroughly understand and intelligently apply the foreign law. Although the written statute may be offered in evidence, it is in such cases not feasible for the court here to have before it or to understand thoroughly and actually the application of the law by the foreign jurisdiction. In addition there is the factual difficulty which often exists by reason of the inability of the foreign seamen to speak English and to clearly present to the court their side of the controversy. As pointed out in The Leonidas, supra, the jurisdiction of the district courts of the United States have recently been frequently invoked by foreign seamen in the matters of wage controversies; and in most of the decisions jurisdiction has been declined. See The Prince Pavle, D.C., 32 F.Supp. 5; Athanasios Veziris v. S. S. Taxiarchis;[1] The Estrella, 3 Cir., 102 F.2d 736. In the cases of the John Knudsen,[1] (D.C.S.D.Cal.) and the Binna,[1] (D.C.S.D.Tex.), the courts declined to exercise jurisdiction in wage controversies arising on a Norwegian ship; but it will be noted that both these cases arose before the recent occupation of Norway by Germany. See, also, The Wind, D.C., 22 F.Supp. 883; and compare Van Der Weyde v. Ocean Transport Co., 297 U.S. 114, 56 S.Ct. 392, 80 L.Ed. 515, dealing with the case of a Norwegian ship occurring prior to the recent Treaty with Norway.

While there are very cogent reasons for declining jurisdiction generally in such cases, I have concluded that an exception ought to be made in this case for the following reasons. In this circuit it is said the jurisdiction should be exercised when it is necessary to do so "to prevent a failure of justice, or when the rights of the parties would be thereby best promoted". The Eir, 4 Cir., 60 F.2d 124; Heredia v. Davies, 4 Cir., 12 F.2d 500. It is not disputed that the decision of the Norwegian Consul in this case was provisional only. The libelants would have the right to final adjudication of their claims ordinarily in a Norwegian court. Owing to the occupation of Norway by Germany, and the uncertainty as to conditions now there prevailing, it is at least doubtful whether the Norwegian courts are independently functioning in matters of ordinary litigation. But however that may be, it seems to be definitely clear under present conditions that neither the ship nor the libelants have any present intention of returning to Norway for an indefinite time in the future. With respect to Pedersen, the Dane who joined the ship at Limerick, Ireland, he says that he is afraid to go back to Denmark because he engaged in the recent Spanish war on the side of the "Loyalists" and that he was a communist, although he has retired from the party after certain recent international events. In addition, all the parties to this controversy are now present before the court and have requested a decision on the merits if jurisdiction is assumed. Under these conditions I reach the conclusion that the court should assume jurisdiction in this particular case to prevent a failure of justice or an indefinite delay thereof which would be substantially equivalent thereto, and because the rights of the parties would be thereby best promoted. A somewhat similar conclusion was recently reached by Judge Coleman in this court in the case of The Astra, 34 F.Supp. 152, which, however, dealt with a claim in tort and not a wage controversy, by a Norwegian subject against a Norwegian ship.

On the merits of the case I reach the conclusion that the libelants are not entitled to recover the wages in dispute. The main ground on which they base their claim for the full payment of wages

---

[1] No opinion for publication.

and bonus is that they were properly entitled to a discharge from their services by reason of the existing war conditions. They also allege ill-treatment by the captain. The latter claim need be only briefly discussed. It is based on the fact that the ship departed from the convoy under which it left Swansea, England, two or three days after the ship had started with the convoy; and on the further fact that after five days from Swansea, the captain did not maintain, during the day time, a look-out from the masthead. The captain, however, explained that his reason for departing from the convoy at the time he did so was because the ship was in ballast and the condition of the sea and wind was such that he could no longer steer a course with the convoy. Furthermore, he explained that at the time he was out of the danger zone. And with respect to the absence of a look-out in the crow's nest during the day time, there was no necessity therefor as conditions could then be observed during the day time from the bridge. These were all matters clearly left to the judgment and discretion of the master and the contention of the seamen in this respect seems so far fetched and unreasonable that it suggests a pretense rather than a substantial complaint. Clearly it does not amount to ill-treatment of the men by the master.

■ The other contention as to increase of danger from war risk is more substantial with respect to the seven Norwegian sailors, although I think without any merit with regard to the two Danish seamen who joined the ship at Limerick, Ireland, about June 26th. Most of the testimony submitted for the libelants with respect to the increase of war risk danger comes from Pedersen the Dane who joined at Limerick. To some extent at least he has undertaken to be the spokesman for all nine libelants, the eight others not being able to speak English. His complaint of an increase in war risk danger between the date of his joining the ship and the present time seems quite unsubstantial. The case is not so clear as to the seven Norwegian libelants who joined the ship at the end of December, 1939.

■ ■ Under the shipping agreement entered into by the seven Norwegian seamen at Kristiansand on December 28, 1939, their period of service was 18 months, and the ship was not restricted as to voyages to be made or ports of call.

Under the Norwegian law the seamen were not at liberty to terminate their employment within the period of 18 months unless thereafter it developed that (1) there was danger of the vessel's being seized by a belligerent power or (2) exposed to war damage or (3) that such danger had been materially increased or (4) they were ill-treated by the captain. On December 28, 1939, the war between Germany on the one hand, and France and England on the other, had been in progress for nearly four months and it is not disputed that there had been much war damage by Germany to neutral shipping in and about the British Isles during this period. This being the situation at that time, and as we have found there was no subsequent ill-treatment by the captain, the issue of fact in the case on which these libelants must rely to justify their present termination of their employment, is that the war risk danger to the ship has since then been "materially increased"; and it is to be noted that the Norwegian law provides that in the event of the development of that fact "the seaman shall be entitled to take his discharge * * * at the first port where the vessel calls after the seaman had become aware of the circumstance in question". The burden of proof to establish the material increase in war risk was therefore upon the libelants. I have not been furnished by counsel with any applicable decisions of the Norwegian courts as to the proper interpretation and application of the Norwegian law in similar or analogous conditions. In the absence of such enlightening decisions on the Norwegian law I take the view that a "material increase" in the war risk implies something more than a mere fluctuation from time to time of the intensity of an already existing warfare. It could hardly have been reasonably intended by the Norwegian law that a seaman shipping during an already existing intensive and extensive warfare affecting shipping and with full knowledge of such conditions, would be entitled at his mere election, and on the statement of his personal opinion that the war risk had been increased, to discontinue his services and require the master of the ship to pay full wages and war bonus accrued at any port where the ship touched. I interpret the law as meaning that there must be some new development which is capable of ascertainment by proof of facts rather than susceptible only of divergent opinion. In

this case the libelants have not submitted proof of any evidentiary facts to support their contention that there has been a material increase in the war risk danger to their ship. The testimony that they offer is that of the libelant, Pedersen, who undertakes to speak for all the libelants, to the effect that they sincerely and genuinely believe the danger has been materially increased. About the only concrete basis advanced for this opinion is the experience of the men with respect to the convoy. On the other hand the respondent submits the more definite testimony of the master of the ship who has had long experience in seamanship and also the testimony of the Norwegian Consul, that the war risk danger to the ship has not been increased since December 28, 1939. No testimony has been offered of definite facts upon the subject. It would seem that relevant testimony on this point might have been obtainable in the matter of comparative rates of marine risk insurance applicable to this ship; or possibly factual data as to ship sinkings in the war zone in the period before and subsequent to the seamens' engagement.

 Counsel for the libelants also ask the court to take judicial notice of general international conditions, and it is contended that on the basis of general common information the court should find there has been a material increase in the war risk. But on the other hand, counsel for the respondent maintains the contrary as to presently existing conditions. In this conflict of opinion testimony in the case and argumentative inferences from assumed knowledge of general conditions, it would be unsafe to make a judicial finding of fact importantly affecting the rights of the parties under their contractual arrangements. The court can, of course, properly take judicial notice of existing world conditions about which there can be no dispute. 23 C.J. 118; United States v. Hamburg-Amerikanische Packet-Fahrt-Actien Gesellschaft, 239 U.S. 466, 467, 475, 36 S. Ct. 212, 60 L.Ed. 387. Thus we know that the war began about September 1, 1939, and we also know the general course of the developments of the war since then. Particularly relevant in this connection are the facts that Germany occupied Norway in April, 1940, and also occupied Belgium, Holland and parts of France in May and June, 1940, and that Italy declared war on France and England about June 10, 1940. From these facts it may be safely found that the extent of military conflict on land has been greatly extended during this year and that the theatre of war operations in the Mediterranean have also been extended. On the other hand it is pointed out by counsel for the respondent that the developments of the war have included strengthening defensive protection of shipping in and around England by the development of the convoy system and otherwise. We are also not dealing with a situation in which the ship is now proposing voyages into the war zone not contemplated when the seamen shipped. Furthermore, it is importantly to be noted that the Norwegian law provides that in the event of increase in war risk danger, "the seaman shall be entitled to take his discharge * * * at the first port where the vessel calls after the seaman has become aware of the circumstance in question." In this connection the established fact is that the ship called at the port of Limerick, Ireland, about June 26, 1940, where she remained for several days, and thereafter proceeded to Swansea, England, where she remained until about July 7th. Such prominent and definite undisputed facts as have above been mentioned as to the course of the war had occurred before the ship left Limerick and Swansea, respectively. There is clearly no evidence in the case either of specific facts or generally accepted knowledge that is sufficient to show a material increase of the war risk to the ship since sailing from Limerick and Swansea. The failure of the seamen to terminate their employment at Limerick or Swansea, together with some of the testimony in this case and other circumstances appearing in the recent case of The Leonidas, supra, and some other recent cases suggests that the present position of the seamen may be largely influenced by their preference for shipping out of American ports for various reasons. But however that may be, I find no sufficient justification for the change in their position toward their term of service indicated by their failure to demand their discharge at Limerick or Swansea, and their present demand for it here.

 I conclude, therefore, that the libelants have not sustained the burden of proof incumbent on them to justify their

438

present discharge and entitle them to present payment of accumulated wages and bonus.

The libelants assert that they are sincerely and genuinely afraid to continue further service on the ship by reason of existing war conditions. Whether the extent of the war danger has been materially increased or has decreased, it is nevertheless clear, of course, that their continued services as seamen on a ship making voyages to ports in or adjacent to English waters entails admittedly substantial personal risk and danger. If for this reason these seamen are unwilling to continue to encounter perils of the sea in time of war, which many others of their own country and of other belligerent and neutral countries are meeting, there is now no physical restriction on their personal freedom of action in this respect. And it is not intended by anything said in this opinion to personally criticize them for their election to discontinue their services, as that is a matter for their individual decision. But under the testimony in this case they have not met the burden of proof required to legally justify their breach of contract by discontinuing their services; and therefore the court is of the opinion that they are not entitled to both voluntarily terminate their employment and receive wages and bonus they now demand. Title 46, U.S.C. § 701, 46 U.S.C.A. § 701. The master of the ship has testified that despite their recent previous refusal to perform their services, nevertheless he is ready and willing to now pay them their accumulated wages and bonus if they will continue in the service of the ship in accordance with their contracts. They therefore have their election in the matter to discontinue services and forfeit back pay, or to continue their services with full pay.

 With respect to the amended libel setting up the additional contention based on an alleged demand for further wages under section 597 of Title 46 of the United States Code, 46 U.S.C.A. § 597, I will permit the amended libel to be filed in order that the whole case may be disposed of at this time. There is sharp and direct contradiction on the question of fact as to whether the libelants did ever demand their half wages. Pedersen testifies that he did make this demand for himself and he subsequently added that it was on behalf of other libelants also. One other of the libelants testified that he made the demand for himself individually but not for the other libelants. On the other hand, the master of the ship testified that no such demand was ever made on him for half wages by any of the libelants. On this contradictory testimony after hearing the witnesses, I find that such a demand for half wages was not made. Pedersen said he made the demand after the original libel had been filed. If made, it was clearly inconsistent with the prior position which the libelants had taken. The circumstances in this respect are similar to those described by Judge Augustus N. Hand in the case of The Belgier, D.C., 246 F. 966, where it was held that the demand was not made in good faith. See, also, The Nigretia, 2 Cir., 255 F. 56, certiorari denied, 249 U.S. 612, 39 S.Ct. 386, 63 L.Ed. 802; The Italier, 2 Cir., 257 F. 712.

For these reasons I conclude that the original and amended libel must be dismissed. Counsel can prepare and present the appropriate order in due course. I have included in this opinion the findings of fact in intended compliance with the applicable admiralty rule. If further findings are desired, counsel may submit them for consideration.