### THE PRAHOVA.

#### No. 1386–Y.

District Court, S. D. California, Central Division.

April 15, 1941.

Herbert R. Lande, of San Pedro, Cal., for libelant.

McCutcheon, Olney, Mannon & Greene, and Chaplin E. Collins, all of Los Angeles, Cal., for claimant and respondent.

YANKWICH, District Judge.

By his libel in rem, George Angelescu, a seaman, acting as third officer on the Roumanian ship "Prahova", which has since changed its registration to the Republic of Panama, and has been renamed the "Tropicus", seeks his discharge from the service of the vessel and the sum of $1,176, alleged to be due him. More details as to the nature of the claim appear in the opinion filed on the motion to dismiss by the Honorable James Alger Fee, sitting in our District, on April 3, 1941. 38 F.Supp. 227.

■ The claimant, Dolphin Company, Inc., has filed an answer which, in addition to general denials, pleads several special defenses. The claimant challenges the jurisdiction of the court. It insists that by reason of the alienage of the libelant, and the fact that his contract, made in the Roumanian language, with Roumanian owners, must be construed according to Roumanian law, this court is without jurisdiction. This contention is answered fully in Judge Fee's opinion.

■ We add that, while we have discretion in entertaining jurisdiction of controversies between foreign seamen and their ships, in our ports (see Charter Shipping Co., Ltd., v. Bowring, Jones & Tidy, Ltd., 1930, 281 U.S. 515, 50 S.Ct. 400, 74 L. Ed. 1008; Canada Malting Co. v. Paterson Co., 1932, 285 U.S. 413, 52 S.Ct. 413, 76 L.Ed. 837; Heredia v. Davies, 4 Cir., 1926, 12 F.2d 500; The Sonderborg, 4 Cir., 1931,

47 F.2d 723; The Taigen Maru, 9 Cir., 1934, 73 F.2d 922; The Leonidas, D.C.Md., 1940, 32 F.Supp. 738), the facts in the case, to be alluded to further on in the opinion, confirm Judge Fee's ruling and compel us to exercise discretion in favor of jurisdiction. See 46 U.S.C.A., Sec. 597; Dustin v. Murray, 1871, 8 Fed.Cas. 144, No. 4,201; The Helen Fairlamb, D.C.Pa., 1918, 251 F. 412; Strathearn S. S. Co. v. John Dillon, 1919, 252 U.S. 348, 40 S.Ct. 350, 64 L.Ed. 607; The Estrella, 3 Cir., 1938, 102 F.2d 736.

Other defenses urged are that the libelant breached his contract by failure to perform faithfully his work, and that he should be denied recovery because of his failure to comply with the conditions of discharge and repatriation outlined by the Royal Roumanian Legation of the United States.

■ In dealing with a ship of foreign registry, it is difficult, at times, because of the barrier of language, to untangle the facts behind disagreements between the Captain of a ship and the members of his crew. See the observations of Judge Chesnut in The Austvard, D.C.Md., 1940, 34 F.Supp. 431, 435. Fortunately, the Captain and the libelant speak English, although the libelant's knowledge is rather limited. The correspondence relating to the controversy is written mostly in Roumanian, partly in French. A knowledge of these languages has made it easier for me to interpret it, and the Roumanian law, which governs. See Rainey v. New York & P. S. S. Co., 9 Cir., 1914, 216 F. 449; The Baymead, 9 Cir., 1937, 88 F.2d 144; Petter Lassen, D.C.Cal., 1939, 29 F.Supp. 938.

As the documents are pieced together, it is apparent that the libelant and his Captain had difficulties during the major part of their relationship, which began at Genoa, Italy, on February 8, 1940, when a contract of employment was entered into between the libelant and Captain Alexander Tiufiaeff, captain of the ship. The contract is written in the Roumanian language. It embodies, as its conditions, sections of the Roumanian Maritime Code and is witnessed by the Roumanian General Consul at Genoa, Italy.

Libelant's difficulties, amply corroborated by testimony in the record, are told graphically in the following translated excerpts from the Log of the "Prahova", kept by the Captain:

"February 21, 1940—(Genoa to Rio de La Plata)

"Superintendent Bertaiotta informs me at 8:00 P.M. that 3rd officer who is on watch (Angelescu) is drunk; going to him, I ascertained that his state does not permit him to continue watch. I took watch myself from 8 to 12 midnight and sent 3rd officer to cabin to sleep.

"September 26, 1940—(at Lota, Chile)

"4:00 P.M.—Angelescu leaves ship without permission.

"September 27, 1940—(at Lota, Chile)

"3rd officer returns to ship just before sailing without standing his watch.

"November 16, 1940—(Los Angeles)

"For the second time and being on duty Angelescu leaves ship at anchor on the roads without permission and without being replaced.

"November 19, 1940—(at Los Angeles)

"Angelescu, being on duty and without advising Captain of same, asks Captain for 2-hour shore leave. After he's left, Captain discovers he was on duty. Does not return even at night time to stand watch.

"November 20, 1940—(at Los Angeles)

"3rd officer comes back on vessel at 2:00 P.M.

"November 25, 1940—(at Los Angeles)

"3rd officer who left ship Saturday (Nov. 23) didn't return to ship at 8:00 A.M. as he should have been on duty. For repeating of breaking of discipline and neglect of service, apprentice Angelescu suspended from 3rd officer and is fined 10 days of wages. Comes on board 3:30 P.M.

"November 26, 1940.

"Angelescu goes ashore without permission.

"November 27, 1940.

"Angelescu does not come on board until 9:30 A.M.

"November 28, 1940.

"Angelescu not on board until midday and leaves at 3:30 P.M.

"December 12, 1940.

"Angelescu returns to ship after two weeks leave shore.

"December 29, 1940.

"3rd officer goes ashore while on duty and without permission.

"January 1, 1941.

"Angelescu not on board although ordered on duty.

422

"January 2, 1941.

"Angelescu goes ashore at 9:30 A.M. without permission declaring to Chief Officer that he is not any more in service of ship and is busy with American authorities. 1:15 P.M. officer from American Immigration comes on board and gives Captain order to detain him on board. Guards employed.

"January 3, 1941.

"Angelescu does not come on duty and at 8:30 A.M. Chief Officer asks him the reason. Angelescu states in 4–5 days Roumanian Consul comes on board and that he is not working and does not care for wages.

"In view of trouble with Angelescu and because of repetition of offenses and no cooperation and having in view that I had to engage a guard to watch Angelescu, nd as a man who has lost the trust given him by Immigration Authorities because he broke American laws and because of my instructions from Roumanian Minister of Commercial Marine, I have today suspended Angelescu from position of 3rd officer and from any kind of duties with ship in accordance with paragraph 38 of Roumanian laws."

At one stage of the voyage, and while the ship was docked at Buenos Aires, the Director of the Roumanian Commercial Marine, acting under the authority of law, wirelessed from Bucharest to the Captain of the ship to detach from the ship and repatriate the libelant, along with four others, for trial before the Maritime Tribunal for acts of indiscipline and instigation to mutiny. The order was later countermanded. Repeatedly, the libelant sought his discharge from the ship. His last attempt was made on December 4, 1940, while the ship lay at anchor at San Pedro, California. On December 6, 1940, the Captain informed the libelant that under Roumanian law, he was without power to discharge him without the authorization of the Roumanian Ministry of Marine and that he was requesting such authority. The demands for salaries, bonus, and the cost of repatriation contained in the letter, the Captain also transmitted to the Roumanian Legation at Washington, D. C., for submission to the proper authorities in Roumania.

There was offered in evidence, as Claimant's Exhibit F, a circular, dated May 25, 1940, by the Roumanian Ministry of Marine, stating that, under the law of April 13, 1940, Roumanian members of the crew on ships carrying the Roumanian flag could not, henceforth, be detached from the service without the authorization of the Ministry of Marine. In June, 1940, in a letter written in French from Milan, a copy of this order was transmitted to the Captain of the "Prahova".

On December 15, 1940, the libelant wrote to the Captain a long letter in English, a portion of which only is material. While written in rather poor English, with a mixture of French, it so clearly expresses the desires of the libelant in the matter and so finally and effectively disposes of any claim he might have to demand that the cost of repatriation be paid to him instead of repatriation, that portions of it are reproduced here.

"To the Sir Captain Al. Tieueffiaef ss Prahova.

"I am sorry to anounce you that i cannot just today en morning to come back on board. I received hier on my hotel en anouncement to go to be presented to the 'Principal' of a School, where i am going to take Lessons of corectly English language; After these courses i must to leave US U. S. A. to stay en neighbourhood some time like a 'qarantine' (perhaps en 'Tea Juana) and after to come to Marine School, hier for my preparation.

"Right is that i can take thesse lessons (of English) without to leave ship bicouse is 'night school' but i have not posibility of dayly transportation from ship (6 H pm) and to go back next day to be 8 h am on board. I cannot to found a solution. Only dischargement focil that. Therefore My Captain, i believe if i postponed my discharging have not reason why for some days more or less. * * *

"More, i donnt have intentions to take new job on other ship indiferent the same flag or neutral ships. The time for my license is comming. After i shall be finished with both school and quarantine, perhpas if the sea-roads shall be more free for sailing i will bound to Rumania. I shall be more than glad and for first time during my service under your command, to clear that dischargement, soon and with spirit patern becouse in the same time i ask your helping too, giving my posibility to be grathfully now and en further time."

On January 2, 1941, the American Immigration and Naturalization Service ordered

the owners of the "Prahova" to "detain on board at all United States ports and deport from the United States" the libelant as a "mala fide seaman."

This order was cancelled on January 7, 1941.

In a cross libel, the claimants have sought to recover from the libelant the cost of the guard they engaged at the request of the Insurance Company, to wit, $120.96, following receipt of this order from the immigration authorities.

On January 3, 1941, the Captain suspended the libelant from service. The suspension stated that it was in conformity with Paragraph 38 of Roumanian law.

The legislation referred to is Codul Maritim si Fluvial of February 21, 1907, as subsequently amended. From the original of the Code, which counsel have placed at my service, it appears that, under Paragraphs 37 and 38 of that law, the Captain of a ship may suspend from command for a period of six months to two years, any person who refuses to continue in service, or to perform his duties before the end of the voyage unless prevented from doing so by illness. See Lege pentru Organizarea Marinei Comerciale, Secs. 37, 38.

On January 13, 1941, the Captain, in a formal communication, approved the libelant's detachment from the service and agreed to repatriate him at the owner's expense.

On January 25, 1941, there was posted on the ship and read to the crew the announcement, signed by Brutus Coste, Charge d'Affaires of the Roumanian Legation at Washington, D. C., that the ship had ceased to fly the Roumanian flag and the Roumanian consular authorities would no longer be in a position to protect the members of the crew. The letter contained instructions as to the rights of the members of the crew.

However, because authority for the act had not been received by the Captain from the Roumanian authorities, and because, under American law, he could not pay him off, except upon assurance that the libelant intended to reship, 8 U.S.C.A. § 168, the libelant has never actually been discharged. And the Captain, on the witness stand, frankly so stated.

In justice to the Roumanian owners of the "Prahova", and the Roumanian authorities, it may be said that, in a letter communicated to Judge Fee, they disclaimed any intention of interfering with any of the rights of the parties under American law. However, they endeavored very diligently to compose the differences. There is before us a telegram from the Roumanian Legation at Washington, D. C., dated April 3, 1941, addressed to counsel for the owners. It contains the award made by the Roumanian Legation upon cabled instructions for mediation received from the Director of the Roumanian Commercial Marine,—the authority charged with the enforcement of the Roumanian shipping laws and regulations. By the award, accepted by the owners of the "Prahova", they agree to pay libelant the sum of $400 cash, to pay all expenses of repatriation, including $60 for food and to secure for him a $2500 life insurance policy. Money for these expenses is to be deposited with the Roumanian consul at New York City for six months and to be returned to the owners if the libelant fails to return to Roumania. The libelant, informed of the offer in open court, before trial, declined to accept it.

The dispute here is chiefly factual. And, except for certain claims of authority for absences on the part of the libelant, the narrated facts stand undisputed. The rather full statement will obviate the necessity for longer elaboration of the conclusions reached upon the various matters in dispute.

Whether considered in the light of general maritime law or the principles declared in American adjudicated cases, the conduct of the libelant would have justified his discharge or detachment from the service. Legea pentru Organizarea Marinei Comerciale, Art. 17, 18–37, 38; 46 U.S.C. A. § 701; The Golden Sun, D.C.Cal. 1939, 30 F.Supp. 354; Buchanan v. United States, D.C.Cal., 1927, 24 F.2d 528.

However, there was no such discharge or detachment from the service. The act of the Captain in laying him off, in cutting off his wages on January 3, 1941, was not a severance of the relationship established by the agreement entered into at Genoa, Italy, on February 8, 1940. The Captain frankly admitted that his interpretation of the rights of the seaman under Roumanian law and of the circular of the Ministry of Marine, of May 25, 1940, and which forbade the discharge of Roumanian members of Roumanian crews without the permis-

sion of the Roumanian Ministry of Marine, as well as the penalties of the American law for paying off a seaman in an American port unless it be for the purpose of re-shipping stood in the way. See The Limon, 2 Cir., 1927, 22 F.2d 270.

As we study the correspondence in the original Roumanian, we are impressed by the patience and the good faith of the Captain of the ship. Even under the most trying circumstances and in the face of letters which he, as the master of a ship, had the right to consider insolent in their nature, he endeavored, at all times, to find a way of satisfying the desire of the libelant to detach himself from the service and at the same time fulfill his own duty, as he understood it, towards the Government of his own country and the laws of the United States. The repeated requests of the libelant were not effective for that purpose. They were coupled with demands which could not be granted and called for rejection in the form in which they were made. So we find, as often happens, in contractual relationships, two persons endeavoring to sever an existing relationship, and, yet, because of the conditions attached by one or the other to the apparent desire of both to end the relationship, their minds do not meet and no agreement of severance results. This was the case here.

It follows, therefore, that the relationship created by the agreement of February 8, 1940, continued to exist until the ship ceased to fly the Roumanian flag. See Dustin v. Murray, supra; The Gandia, D.C. N.Y.,1940, 34 F.Supp. 405. The members of the crew were notified of this on January 25, 1941. The libelant signed a copy of the order signifying knowledge of its contents, although reserving his right to protest against it to the Ministry.

In the light of this conclusion, the remaining questions can be determined without difficulty.

The wages of the libelant, computed on the basis of English exchange, were $52 per month. Following negotiations, when the ship reached the Atlantic Coast, the wages of the crew were raised. The libelant declined to accept the raise. However, for a period of two months, prior to his being laid off, he received $95 per month. But as the original written agreement, made in the presence of the Roumanian consul, was never modified, the payment of wages for a period of two months, under elementary principles of law, did not constitute an executed oral agreement, which entitles the libelant to recover the higher sum as wages which may be due him by reason of the facts discussed. He was penalized, as the Log shows, ten days' wages on November 10, 1940, for repeated breaches of discipline and for leaving the ship when he should have been on duty without providing a relief. Under Roumanian law, the penalty was rightly imposed. See Legea pentru Organizarea Marinei Comerciale, Art. 18.[1]

Under the same law, and the very section which is embodied in the agreement, upon the sale of the ship, the owners become liable for two things only: (1) repatriation at the expense of the ship, and (2) payment of salaries. Codul Comercial Maritim, Art. 551.

The sale of the ship constitutes a discharge for good cause. The libelant insists that, because, under American law, on discharge, the seaman is entitled to receive the wages earned (46 U.S.C.A. §§ 596, 597), he should receive the four months' bonus provided by Roumanian law in case of discharge without good cause. Codul Comercial Maritim, Art. 552.[2]

---

[1] It is interesting to note that, under this law, the deduction from wages and the fines imposed are not retained by the owners, but are turned over to an institution called Casa de Ajutor a Marinarilor (Seamen's Aid Society) aiming, as its name would imply, to assist seamen when in need.

[2] A translation of these two sections is here given:

"Art. 551: If, during the time of the voyage, the vessel is sold, the personnel of the crew is entitled to the return to the fatherland at the expense of the vessel and the payment of salaries.

"Art. 552: The Captain may dismiss the seaman before the expiration of enrollment and without being obliged to prove that the seaman has transgressed his duties, but the Captain is also bound to provide the seaman with the necessary means for his return to the fatherland at the time of his dismissal.

"The seaman dismissed without a good reason is entitled also to damages besides the salary for the time he has served. If dismissal occurs in the port where he was enrolled and before the departure of the vessel, the indemnity is equal to one month's salary; if dismissal occurs after departure or in a port of the fatherland other than that where enroll-

We cannot agree with this interpretation. The Roumanian language has inherited from Latin, which is at its base, precision in use and application of words. In the Roumanian original, the phrase translated "payment of salaries" is "plata salariilor". "Plata" means "payment". The word "salariilor" is the genitive plural of "salariu", which means, as does the English word of like origin and meaning, salary, "fixed compensation regularly paid." In Article 552, it is stated that the seaman, dismissed without good reason, shall receive, in addition to his pay for the time served, damages in various amounts, which, in case of discharge in American waters, amounts to his salary for four months. The Roumanian word, which we have translated as "damages" is "indemnitatea", which, like its English equivalent of the same origin and meaning, indemnity, means "remuneration for loss, damage or injury sustained".[3]

The indemnity of four months' wages is not considered as wages earned, but as an indemnity to reimburse for loss, or liquidated damages to make the seaman whole by reason of wrongful discharge. The Roumanian dictionary referred to in footnote 3, uses the words "(Suma data drept) despăgubire." (A sum of money given as compensation for loss.)

Clearly, the salaries contemplated by Section 551 of the Roumanian Commercial and Maritime Code are the wages during the repatriation. This is evident from the phrasing of the article also, as the phrase, "payment of salaries", follows the expression, "repatriation at the expense of the vessel." The Roumanian preposition used is "cu", meaning "with". As, under Roumanian law, the sale of the vessel worked as a discharge for good cause, the indemnity provision does not apply to the situation.

Nor has the libelant shown himself to be entitled to any wages for ac-cumulated vacations of two months earned during the four-year period of service for the owners of the "Prahova", on that ship and on the "Oltul", from which he was transferred, at the rate of fifteen days per year.

The libelant is a man with a fair educational background and knowledge of foreign languages. His correspondence with the Captain of the ship and his discussions of the law in court caused his proctor to call him a "foc'sle lawyer". He attempts to sustain his claim to vacation pay under Articles 85 and 89 of the Roumanian law of April 5, 1929, called "Legea Contractelor de Munca" (The Law of Labor Contracts), and Article 7, Subdivision 8 of the Roumanian law of February 15, 1933, called "Legea pentru Infiintarea, si organizarea jurisdictiei Muncii". (Law for the Establishment and Organization of Courts of Labor.)

The argument is that, because the later statute includes, among its beneficiaries, officers of the Commercial Marine, it automatically confers upon them the benefits of the earlier statute, so far as vacations are concerned. But neither Article 85 nor Article 89 of the law relating to labor contracts mentions officers of the Commercial Marine among its beneficiaries. Nor can the later statute be considered an implied amendment of it. The two statutes are dissimilar. The first regulates the conditions governing contracts of labor between employer and employee, and the undertakings which become a part of each such contract. Obviously, a statute defining substantive rights. The later enactment is a procedural statute. It confers no new rights on labor. It merely establishes tribunals to which disputes between employer and employee may be brought. It defines their jurisdiction, the selection of the personnel, and the manner of performing their duties. It implements the earlier legislation. No doubt, it was in contemplation at the time. For we find,

---

ment was made, the indemnity is equal to 40 days' salary. If dismissal occurs outside the waters of the fatherland, the indemnity is equal to one month's salary while on the European Black Sea coast; to two months' salary on the coasts of the Mediterranean Sea and the other Black Sea coasts; to four months' salary on any other coasts.

"In none of the above cases is the Captain entitled to claim the reimbursement of the indemnities from the owners of the vessel if they did not give their consent to dismissal.

"No indemnity whatever is due the dismissed seaman before the closing of the register."

[3] The latest Roumanian dictionary, to which we have access, defines these terms in substantially the same manner. See, I. A. Candrea—Gh. Adamescu, Dictionarul Enciclopedic Ilustrat "Cartea Româneasca", 1931, s. v. Plata, salariu, indemnitâte, indemnizare.

in the regulations promulgated, under its authority, for carrying it into effect, a provision giving local courts jurisdiction over disputes ·relating to the law, "până la infiintarea jurisdictiei profesionale" (until the establishment of professional judicature) (Regulamentul Contractelor de Munca, January 20, 1930, Article 122.)

The later law did not confer any substantive rights, nor extend to other categories, the benefits of earlier laws. It merely established special tribunals for the determination of disputes arising under labor laws. In Roumanian jurisprudence, as in the jurisprudence of all maritime nations, contracts relating to maritime matters are treated separately. So we find, in the law for the organization of the Roumanian Commercial Marine, detailed regulations of the rights and duties arising out of the contract of employment of a character which could not be applied to labor or services of a different kind.

It is silent on the subject of vacations with pay. And, before we read into such a special statute a provision contained in a general law, it should be made plain that it was clearly in the contemplation of the legislative body to extend to all the benefits of that law. A comparative study of the maritime codes of Roumania shows an intention to place in it all the provisions relating to the contract of employment in the Commercial Marine. And the inclusion of Commercial Marine officers in a jurisdictional statute, so as to make labor courts available to them, is not, in itself, sufficient to extend to members of maritime crews the benefits of previously enacted labor laws obviously available to workers and employees in fields other than maritime. So the claim for vacation pay must fall.

The libelant was laid off on January 3, 1941. Under Roumanian law, referred to, he could thus be penalized for disobedience. Lege pentru Organizarea Marinei Comerciale, Secs. 37, 38. On January 25, 1941, when the "Prahova" ceased to fly the Roumanian flag, the seaman became entitled to his discharge, under American law. He has not been discharged even now. It follows that the seaman is entitled to his discharge and to the wages, which have become due since that date, at the original rate of $52 per month, without penalty. 46 U.S.C.A., § 596. See, McCrea v. United States, 1935, 294 U.S. 23, 55 S.Ct. 291, 79 L.Ed. 735.

The libelant is entitled to be repatriated at the expense of the owners. The libelant, in his letters to the Captain, and in his libel, demands and asks us to compel the owners to pay him money in lieu of repatriation. Granted that proper arrangements could be made to relieve the claimant of its responsibility under American Immigration laws, the libelant contracted with the owners, not for the cost of repatriation, but for repatriation at their expense. To say that, in view of the disturbed world conditions, the libelant is entitled to have his choice is to give him the benefit of something for which the owners did not contract. It is true that the court might, if it appears that repatriation is impossible, order the payment of the cost of transportation in lieu of transportation. At the time the agreement was entered into, what has been denominated World War II had already begun. In fact, the agreement, in its last clause, provided that for the duration of the war the wages be increased 100 per cent. in foreign waters. The occupation of Roumania by Germany, under its protectorate, of which we might take judicial notice, does not, in itself, justify the change in the terms of the contract without the consent of the owners. It appears in the evidence here that such repatriation has not yet become impossible. On the contrary, arrangements have been made for the repatriation of members of the crew on a ship which is to leave the latter part of this month. The libelant has been offered repatriation and has repeatedly refused to comply with the requirements and to secure the proper visas. It is evident from his English letter of December 15, 1940, that he is not in a position to thus appeal to the equity powers of the court, because it is quite apparent that it is not world conditions which compel him to ask that the cost of repatriation be paid to him in English exchange, but his own desire to enter the United States through the Mexican back door as a permanent resident. Laudable as the desire may be, it is not what he and the owners bargained for.

Decree will be for the libelant for his discharge, for wages at the rate of $52 per month from the 25th day of January, 1941, to the date of this decree, to his repatriation at the expense of the company, libelant to comply on his part with all the requirements as to visas required by the American law and the rules of the

Roumanian Consulates. The court will retain jurisdiction to consider whether, conditions changing, it should become impossible for the owners to repatriate the libelant within a reasonable length of time, to hear further evidence and to enter a supplementary decree on the facts then found.

The claimant's demand, in the cross-bill, for the recovery of the amount expended for a guard during the detention of the libelant on board ship on order of the American immigration authorities, is disallowed. We do not believe that the exigencies of the situation demanded the employment of high-priced Pinkerton guards. With the ship lying idle, there were enough members of the crew available to perform guard duty if that was necessary in order to detain him on the ship. There was not much danger that the libelant, a foreign seaman, laboring under the disadvantage of a temporary stop-over, and who had been ordered detained by the American immigration authorities as a mala fide seaman, and who would be under their constant guard from that moment on, would attempt to escape detention. He stood to lose too much by so doing. We should not penalize him for the unnecessary precautions which the owners of the ship took, although they were caused by his own act in inducing distrust in the American immigration authorities as to his good faith.

The allowance of costs in Admiralty is discretionary. See: The Maggie J. Smith, 1887, 123 U.S. 349, 8 S.Ct. 159, 31 L.Ed. 175; Gold v. Matson Nav. Co., 9 Cir., 1934, 73 F.2d 808; Benedict on Admiralty, 6th Ed., 1940, Sec. 435; 2 C.J.S., Admiralty, § 196, subd. b, pp. 339, 340. We feel that the repeated attempts of the owners, through the Captain and others, to satisfy the demands of the libelant, his frequent infractions of the rules, which might have taxed the patience of less humanely inclined employers, the fact that, even after the institution of the libel, they submitted to mediation by the Roumanian Legation in the United States, and agreed to accept the award, which the libelant rejected, in open court, are equitable considerations of the type which Courts of Admiralty should take into consideration in exercising the discretion to withhold costs from the libelant.

The decree will, therefore, be without costs.

Because, as to many of the most fundamental questions, the decree favors the claimant, counsel for the claimant are instructed to prepare findings and decree.