### THE MAGNETIC.

### THE G. R. CROWE.

(District Court, D. New Jersey. October 22, 1923.)

Salvage ⬅31—Award of $5,000 for towing from fire danger vessel worth $317,-000.

A tug, valued at $15,000, which towed to safety a steamship laden with crude and fuel oil and worth, with cargo, above $317,000, from the bulkhead of an asphalt plant which was on fire, with tanks exploding and the wind blowing toward the steamer, *held* entitled to a salvage award of $5,000; the service being promptly and efficiently rendered in less than an hour, but without great danger to the tug.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit for salvage by the Tice Towing Line, as owner of The Tug Magnetic, with Eugene S. Small and another intervening, against The Steamship G. R. Crowe and her cargo of oil. Decree for libelant.

Park & Mattison, of New York City (Henry E. Mattison, of New York City, of counsel), for Tice Towing Line and Peter and Charles Krieger.

Richard J. Mackey, of New York City, for interveners.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark, of New York City, of counsel), for the Crowe and cargo.

RUNYON, District Judge. This suit is brought to recover the value of salvage services rendered by the steamtug Magnetic, owned by the Tice Towing Line, to the steamship G. R. Crowe, belonging to the Montezuma Transportation Company, Limited, on the afternoon of July 18, 1921, upon the occasion of a fire which occurred at the Warner-Quinlan Company's asphalt plant in Tremley, N. J., and at the dock of which company the Crowe, loaded with a cargo of 28,500 barrels of light Mexican crude oil, was moored at the time.

There is no dispute but that the fire started in said plant about 1:30 p. m., and that several asphalt tanks exploded shortly thereafter; that the cargo of the Crowe consisted of crude oil, and that there was a large quantity of fuel oil aboard also; that she was lying at the bulkhead of the asphalt plant when the fire started; that the Magnetic appeared on the scene shortly thereafter, and brought the Crowe to a point opposite the mouth of the Rahway river, where the Crowe anchored about 2:30 p. m. It also appears to be conceded that, when the Magnetic began her services to the Crowe, there was no other vessel about which either would or could have rendered a like service. The weather apparently was clear, the wind blowing off shore in a southwesterly direction, while the ebb tide was almost spent.

On the other hand, there are certain issues concerning which there are wide differences of opinion. The libelants and interveners claim that the Crowe was aground at the dock, helpless, and in great peril, and that it was only by dint of continued and persistent effort that the Magnetic succeeded in pulling her into water sufficiently deep to permit her to float and to be towed to safety. The claimant denies this, and asserts that the Crowe was in no danger whatever; that she had already been released from the dock and was drifting clear of the flames before the Magnetic began her part, which claimant characterizes as towing, and not salvage, services. Naturally, therefore, there ensues a decided conflict as to the value of the services rendered.

One fact cannot be gainsaid. Whatever the merit or magnitude of the Magnetic's services may have been, they were, in all respects, successful. No harm whatever befell the Crowe or its cargo, and it therefore becomes the duty of the court to ascertain, if possible, to whom the credit for this result was due, and in what degree, at what expenditure of labor, efficiency, and courage such result was attained, and what it is worth in a monetary way to the parties interested.

. In the case of The Blackwall, 10 Wall. 1, 14, 19 L. Ed. 870, Justice. Clifford has set forth the main elements which should guide a court in determining the amount of salvage due, and which elements are as follows:

"(1) The labor expended by the salvors in rendering the salvage service. (2) That promptitude, skill, and energy displayed in rendering the service and saving the property. (3) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4) The risk incurred by the salvors in securing the property from the impending peril. (5) The value of the property saved. (6) The degree of danger from which the property was rescued."

In the case at bar, such labor as was expended was the product of the four members of the Magnetic crew, viz. the captain, engineer, fireman, and deckhand, and lasted perhaps 40 or more minutes in all; not a very imposing force possibly, but these four men represented the entire man power of the Magnetic; not a great length of time involved, but sufficient in every respect to accomplish the end sought. In other words, the Magnetic, for as long a time as was necessary, gave all the potentiality she had, gave it promptly and with energy, and, while the skill displayed in attaching the heavy line for towing purposes is the subject of dispute, any shortcoming on the part of the Magnetic's crew in this respect cannot be interpreted as being harmful to the Crowe in any way.

I am likewise convinced that the members of the crew of the Crowe, who stayed with her, not only did not object in any way to the rendition of the Magnetic's services, but were vocally and insistently anxious to secure them. The employees of the Crowe had left her for a while, and were apparently outside of the danger zone when certain ones returned, presumably to serve the Crowe's welfare, inasmuch as they boarded her again, and it was at the solicitation of these returned members of the Crowe's crew that the services were given.

This conflagration differed in several particulars from an ordinary fire. In the first place, it was accompanied by explosions of the asphalt tanks met in its progress, and this fact furnished an element of more than ordinary danger. In the second place, the Crowe was loaded with an inflammable cargo, crude oil, in tanks, to be sure, with hatches battened down, and yet not altogether impervious, by any means, to the possible attacks of great heat and flying missiles; and concededly the wind was blowing off shore—that is, from the fire itself—in the direction of the dock, where the Crowe lay moored, a combination fraught with decided danger to life and property.

That the members of the Crowe's crew believed this to be the case I am convinced from the evidence, and I am likewise sure that, if the Crowe had been drifting away from the dock, as testified to in the claimant's behalf, the urgency of the appeal for help which appears in the testimony would have been lacking. At the same time I am not unmindful of the fact that the men who returned to the Crowe did so after having had an opportunity to reflect upon the nature and imminence of the danger involved, and the very fact of their return is, to my mind, indicative of a belief on their part that the rescue of their vessel might be had with some degree of safety to themselves, if under-

taken with no unnecessary loss of time. For them to have proceeded on any other theory, human life not being at stake, would have been no less than suicidal.

The Magnetic has been variously appraised as being worth from $10,750 to $20,000, and the owners apparently valued her at the time of the salvage at the sum of $15,000. She was built in 1884 and is 63 feet long. On the other hand, the Crowe, with her cargo aboard, was worth, according to claimant's own figures, $317,630 while the interveners claim the total value as being in the neighborhood of $669,-000.

Under other circumstances, the question of these comparative values would loom large, but in the present case I am convinced that the Spaniel, big and powerful tug, also belonging to the Warner-Quinlan Company, appeared on the scene in ample time to have assisted the Crowe to safety, even if the Magnetic had not previously rendered the service, and that therefore the Crowe does not owe her actual existence today to the Magnetic and her crew, meritorious though their combined services were.

That the Magnetic's crew did everything asked of them, and did it well, I am convinced, and that the danger was not as overwhelming, or the need of their services as imperatively necessary, as might otherwise have been the case, detracts in no sense from the credit due them. But in a monetary sense, and under the facts as I find them to be, there cannot be the recovery which otherwise would obtain. I am of the opinion that the salvage services rendered the Crowe are worth the sum of $5,000, and that two-thirds of this amount should go to the owners of the Magnetic, the remaining one-third to be divided among captain and crew in proportion to their respective wages, the captain to receive a double portion.

I cannot, however, accede to the proposition that young Mr. Krieger is entitled to any share in this award as a cook, or in any capacity other than as a deckhand. In this latter capacity he probably renders efficient and satisfactory service, but his own testimony refutes the idea that he did any cooking for the Magnetic. If his employer desires to pay him money, and indulge in the pleasant little fiction that it is for services as cook, whereas, there are no services as cook rendered by him, that money is certainly not wages—wages being, according to Webster, "a compensation given to a hired person for services; price paid for labor; recompense; hire." Wages being the basis upon which awards in these cases are distributed, he is clearly without the scope of their operation, so far as his imaginary employment as cook is concerned