## THE JACOB LUCKENBACH.

District Court, E. D. Louisiana.   September 9, 1929.

No. 18845.

382

Henriques-Duchamp & de la Houssaye and W. I. Connelly, all of New Orleans, La., for libelants.

Terriberry, Young, Rault & Carroll, of New Orleans, La., for respondent.

BORAH, District Judge. This is a proceeding in admiralty in rem by thirty-four seamen, members of the crew of the S. S. Jacob Luckenbach, against the vessel, praying for (1) a bonus in the amount of $100; (2) two days' wages from July 17th up to and including' such time as the court may consider proper under the circumstances; (3) remission of all fines and penalties assessed against libelants; (4) transportation or its money equivalent from New Orleans to San Francisco.

Before undertaking to· discuss these demands, I shall discuss briefly the facts as they appear from the evidence.

On April 26, 1927, the S. S. Jacob Luckenbach, then in the port of San Francisco, signed on a full crew of licensed and unlicensed men under articles stipulating for a voyage from the port of San Francisco, Cal.,¡ to New Orleans, La., and such other ports and places in any part of the Atlantic coast as the master may direct and back to San Francisco, Cal., a final port of discharge in the United States, for a term of time not exceeding six calendar months.

The intended route of the vessel was down the west coast of North America, through the Panama Canal, thence to New Orleans and other Gulf ports, and return via the Panama Canal to San Francisco.

While proceeding down the west coast of Central America, the vessel stranded on the rocks off the coast of Costa Rico, where she remained from May 8th to May 16th. On May 16th she was floated with the aid of salvors, and proceeded to Port Culebra, Costa Rico, where she underwent temporary repairs. Temporary repairs having been made, the vessel proceeded to Balboa, arriving at her destination on June 1st. She remained there for twenty days awaiting the arrival of the surveyor for the hull underwriter and the representatives of the cargo underwriters. On June 20th the vessel was placed in the graving dock of the United States government, but was kept partially water borne, the water being pumped down below the lower tween deck level to enable the necessary repairs to be made. Temporary repairs were made to enable the cargo to be forwarded to the Gulf in order to avoid the expense of discharging and reloading; they were completed on June 27, 1927, and the vessel was undocked.

On June 22d the libelants, with the exception of the engineer officers and the third mate, addressed a written petition to the United States Shipping Commissioner requesting a survey of the vessel on the grounds that she was unseaworthy and unsafe in her present condition to continue the voyage. The petition further stated:

"The Steamship Jacob Luckenbach grounded off the coast of Costa Rico causing great rents in her bottom and causing many places to leak and, we believe, weakened her throughout.

"At the present time it is contemplated to have this ship proceed to the completion of her voyage with the condition of the bottom as above stated; by forcing the water from the hull with compressed air, and we believe

that a voyage to any Port upon the East Coast of the United States during the present season of the year, i. e., the hurricane season, is dangerous and may result in the ship and ourselves being lost.

"In addition to the ship being materially unseaworthy, there is caused by the water soaked cargo certain gasses which we understand and believe to be detrimental to our health and may be fatal to our lives.

"On these grounds we request a survey which we believe is provided by law."

Acting on this petition, the Deputy United States Shipping Commissioner appointed a survey board, comprised of three members who surveyed the vessel while she was in dry dock on June 24th and while she was afloat after having come off dry dock on June 27th. They rendered their opinion in a written report dated June 28th, which reads as follows:

"We, the undersigned surveyors, as requested by the United States Shipping Commissioner, Balboa, did board the Steamship Jacob Luckenbach in the Balboa Drydock on Friday, June 24th, and again while afloat at Dock No. 8 on Monday, June 27th, for the purpose of ascertaining and reporting on the seaworthiness of said vessel after temporary repairs had been completed, with new hatches sealed under 2½ lbs. air pressure on both lower decks in No. 1 and No. 2 holds.

"We have investigated all complaints made by the crew, and have examined all forward lower decks previous to sealing; and find that decks have been reinforced to compensate for air pressure now carried, and in our opinion the ship is in a safe and seaworthy condition to proceed to New Orleans.

"We have recommended that an additional air compressor be carried on the vessel for emergency, if needed, and this has been delivered on board.

"We have recommended that the Panama Canal chemist examine the fire room, engine room and quarters of the crew and that his requirements be carried out.

"We consider that this complaint was warranted."

On June 28th, A. McWatt, surveyor to Lloyd's Registry of Shipping, issued a seaworthy certificate on the vessel; on the same date the hull insurance surveyor pronounced the vessel seaworthy and fit to proceed to New Orleans. The owner's personal representatives also pronounced the vessel seaworthy, and, in addition, representatives of the cargo insurers agreed that the vessel proceed to New Orleans on June 28th.

The survey report, coupled with the attitude of the owners and underwriters, disheartened the members of the crew, and they began to talk amongst themselves and to discuss the great risk they would be subjecting themselves to should they go to sea on the vessel in her then unseaworthy condition. The crew were aware of the condition of the ship's bottom, for this startling information was disclosed in part by the diver in the presence of at least one of their number, and they realized that the only thing that could keep the vessel afloat was compressed air. They were aware of the fact that the only compressor aboard was lashed to a boom rest on the forecastle head, that it was installed with a plain rubber hose, already much used, and that the boom rest on which the compressor was lashed had on a previous trip been carried away during heavy weather, and they realized that their lives would be imperiled if there was a repetition of this occurrence. The survey board had recommended that an additional air compressor be carried on the vessel for emergency, if needed. This air compressor had been delivered on board, but it had not been installed, and apparently no preparation had been made to install it. McWatt, surveyor to Lloyd's Registry of Shipping, had also included in his recommendations that a spare compressor be installed on board, but no effort was made to install same until after the crew left the vessel and the engineer officers and third mate protested with reference thereto.

On the afternoon of June 28th, the unlicensed members of the crew having probable cause to believe that the master would endeavor to set sail in the vessel's then unseaworthy condition, they called on the master, and expressed to him their opinion about the ship's unseaworthiness, and asked to be paid off and discharged. This the master refused to do, and, as a consequence, when he gave the orders to take the vessel out into the stream and begin the voyage, most of the unlicensed crew, including all of the libelants herein except the licensed officers, picked up their belongings and stepped ashore.

Subsequent to this happening, a consultation was had between the engineer officers and the third mate, and the conclusion was reached by them that the ship was unseaworthy, and that additional work was necessary before they would undertake the voyage to New Orleans. Accordingly, they addressed the following communication as a recommendation to the United States Shipping Commissioner:

"We, the undersigned officers of the above named vessel, do not deem this vessel to be seaworthy, due to new developments that have

arisen since this ship was last surveyed and recommend the following repairs, installations and changes:

"To install spare air compressor, piped up and run in place of the one now in service, keeping the latter as a spare.

"To install copper flexible air hose in place of the one now in use.

"To install a wrecking pump in the shelter deck in No. 2 hold with about a 2 inch pipe suction to handle the leakage through the deck from the lower hold into the tween decks to the same hold, the same to have the suction to be placed on both sides with valves and suitable discharge leading therefrom.

"Wooden hatches in the shelter deck to be shored off substantially to compensate for the pressure under it.

"Considering that the proposed journey to New Orleans with its vessel in its present condition will be a hazardous undertaking for an unexperienced crew, we recommend that the old crew be reinstated or an experienced crew hired in their place.

"We also do not believe that the master of this vessel is competent to command the ship in its present condition."

Pursuant to this request, the United States Commissioner directed that a resurvey be held by two of the members of the original survey board. This board in turn reported in part as follows:

"That the recommendations be carried out as outlined by the engineer officers of the steamer Jacob Luckenbach with the exception of the paragraph commenting upon the Master's competency.

"It is the opinion of this board that the crew be removed from the after part of the vessel and furnished accommodations amidships in the unused staterooms."

Their recommendations were carried out. The water hose which had been used on the original compressor was replaced with a flexible copper hose, and the original compressor was moved back to the midships of the vessel and the spare compressor was installed alongside. These compressors in their new positions were securely lashed and made fast.

After this additional work had been done, the agent of the Luckenbach line conferred with a committee appointed by the crew, and, after some discussion, advised them of the additional repair work which had been done to render the vessel more seaworthy, and suggested that, if the crew would return to the ship and made the trip to New Orleans, he had been authorized by the owners to offer the men certain additional inducements. The men accepted these offers, and the following supplemental agreement was entered on the back of the original articles:

"Balboa, C. Z., July 7, 1927.

"Supplemental Agreement.

"It is agreed that the master shall pay to each member of the crew in these articles with the exception of Nos. 1-5-11-43-46-47 and 48 the sum of $100.00 as a bonus, upon the arrival of the vessel at its destination at New Orleans, La., and it is further agreed that the said members of the crew, as shown above, shall be discharged and paid off within forty-eight (48) hours after the vessel arrives at its destination as aforesaid. [Signed] T. T. Torjusen, Master of the S. S. Jacob Luckenbach.

"Signed before me, W. A. Stevenson, Deputy Shipping Commissioner, Balboa, Canal Zone, this July 7, 1927. [Signed] W. A. Stevenson, Deputy Shipping Commissioner, Balboa, C. Z."

In accordance with this supplemental agreement and contract, the vessel sailed for New Orleans on July 8th, arriving at New Orleans on July 15th. During the entire trip the vessel sailed with the use of the compressors which had been installed. On arrival at New Orleans the vessel proceeded into the Industrial Canal, where the cargo was discharged. Upon the air compressors being stopped, she sank by the head, and rested on the mud of the canal, drawing 42 feet of water forward.

After arriving at New Orleans, the men were offered their wages to date and were refused the extra compensation promised or any money for their transportation and subsistence back to San Francisco; this they refused to accept on the grounds that they were entitled to the other items. On August 1st they were finally paid off, having been evicted from the ship, and they were obliged to accept, under protest from the Shipping Commissioner, the wages then tendered to them.

Having these facts in mind, consideration will now be given to the issues presented. For convenience, the first, second, and third demands will be grouped for discussion.

Claimant insists that this supplemental agreement was obtained by duress, and therefore is not binding on it, and for that reason it does not owe the bonus. The claim of two days' pay for one day is denied, because the bonus, not being owed, the penalty does not exist, and furthermore the claim for the penalty is not of the kind contemplated by the statute. Claimant further urges as a matter of fact that it never agreed at any time to

cancel the fines and penalties, and asserts as a further defense to this demand that libelants are precluded from varying the terms of this written instrument by parole evidence.

A further detailed examination of the evidence with reference to the facts bearing on these issues discloses that the negotiations which preceded the adoption of this supplemental agreement were carried on between Driscoll, the personal representative of the owner, and a committee of three representing the crew. It appears from the evidence that the idea of offering the bonus as an inducement for the crew to return to the ship first germinated in the mind of the Deputy United States Shipping Commissioner, and it likewise appears that the agent and personal representative of the owner was authorized to pay a bonus not exceeding $100 to the crew, and that he in fact sought out a committee representing the crew, and negotiated with them direct after a chance meeting with the attorney who had been retained to represent the crew's interest. As to be expected, there is considerable dispute as to what was the understanding between the parties with reference to the extent of the inducements offered; however, there is no dispute as to the fact that these negotiations preceded the supplemental agreement; therefore, if this contract is binding, it will not be necessary to resolve these conflicts in the testimony, as parole testimony is not admissible to vary or alter the terms of a valid written instrument.

It also appears from the evidence that the Jacob Luckenbach was unseaworthy at the proposed sailing time on June 28th, and this constituted a breach of the articles by respondent. The superficial and exceedingly unsatisfactory examination made by the marine surveyors on giving their certificate of seaworthiness cannot, nor can their formal certificate, avail against the clear evidence furnished within a week later, that the ship must have been at that time totally unsafe to undertake the voyage she was to enter upon. The report of Johnson, the diver, the survey report of the marine surveyor and appraiser, Jordan, the fact that when she arrived in New Orleans and her compressors were stopped she sank by the head and rested on the mud with water up to her hawse pipes, and the facts surrounding her subsequent abandonment as a constructive total loss, constitute convincing evidence that libelants were justified in refusing to remain by her; consequently they were released from all obligation or duty to go to sea in her. Under the circumstances, their return to duty is to be regarded as a new service and a new and voluntary assumption of risks for a new consideration. But it is urged that the claim for a bonus should be denied to the officers who are libelants, for as to them there was no consideration for the payment of a bonus, and they should be estopped from asserting any claim thereto. It is clear from the evidence that the officers did not demand a bonus, but that same was voluntarily offered to them as a promise of extra reward to induce them to abide by their contract; such a promise is binding, and the court so held in Schermacher et al. v. Yates et al. (D. C.) 57 F. 668.

Having determined that the supplemental agreement is binding and will be upheld, the third demand, for reasons stated, is untenable; however, there remains for determination the question whether or not libelants are entitled to any recovery under their second demand. Under USCA, title 46, § 596, "the master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days  *  *  * termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens.  *  *  * Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court.  *  *  *"

It is clear that this statute applies only to "wages." The wages of the crew were the monthly payments designated in the articles, and these were paid in full. This being a penal statute, it must be strictly construed, and, when so construed, can have no application to a bonus, which is a word of fixed and determinate meaning, and in no sense synonymous with the word "wages." Petterson v. U. S. (D. C.) 274 F. 1000; Kenicott v. Wayne County, 16 Wall. 452, 21 L. Ed. 319.

Consideration will now be given to the remaining issue in the case; that is, libelant's demand for transportation or its money equivalent from New Orleans to San Francisco. This demand is predicated under US CA, title 46, § 593, which reads as follows:

"In cases where the service of any seaman terminates before the period contemplated in the agreement, by reason of the loss or wreck of the vessel, such seaman shall be entitled to wages for the time of service prior to such termination, but not for any further period. Such seaman shall be consid-

ered as a destitute seaman and shall be treated and transported to port of shipment as provided in sections 678, 679, and 681."

As indicated in this section by the reference thereto, sections 678, 679, 681, and 593 are in pari materia, and must be construed together. The sections thus referred to contemplate and relate only to transportation from a foreign port to a port in the United States. The conclusion is therefore obvious that section 593 has no applicability to the case at bar, and this demand in consequence is rejected.

A decree may be entered in favor of the libelants in accordance with this opinion.