### LAKOS et al. v. SALIARIS.
### THE LEONIDAS.
#### No. 4670.

Circuit Court of Appeals, Fourth Circuit.

Dec. 31, 1940.

Sol C. Berenholtz, of Baltimore, Md., for appellants.

Robert W. Williams, of Baltimore, Md. (Ritchie, Janney, Ober & Williams, of Baltimore, Md., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal from an order dismissing a libel filed by five Greek seamen against the Greek steamship Leonidas. The purpose of the libel was to recover as balance of wages a so-called "war bonus" of 80% of the basic wage scale plus two pounds ten shillings per day while in belligerent areas. The court below, being of opinion that the "war bonus" did not constitute wages within the meaning of 46 U.S.C.A. § 597 and that the interests of justice did not require it to adjudicate the controversy between the foreign seamen and a vessel of their own country with respect to the "war bonus", declined jurisdiction. The Leonidas, D.C., 32 F.Supp. 738.

Four questions are presented by the appeal: (1) whether the statute in question has relation to foreign seamen on a foreign vessel ending a voyage in a port of the United States; (2) whether the war bonus constitutes wages within the meaning of the statute; (3) whether payment of wages to the seamen themselves upon completion of the voyage is required by the statute notwithstanding their agreement that a portion thereof be sent to a foreign country; and (4) whether the courts of the United States are required to assume jurisdiction of the controversy with regard thereto. We think that all of these questions must be answered in the affirmative.

The statute in question, 46 U.S.C.A. § 597, which was intended by Congress to guarantee to seamen the payment of their wages, is as follows: "Every seaman on a vessel of the United States shall be entitled to receive on demand from the master of the vessel to which he belongs one-half part of the balance of his wages earned and remaining unpaid at the time when such demand is made at every port where such vessel, after the voyage has been commenced, shall load or deliver cargo before the voyage is ended, and all stipulations in the contract to the contrary shall be void: Provided, Such a demand shall not be made before the expiration of, nor oftener than once in, five days nor more than once in the same harbor on the same entry. Any failure on the part of the master to comply with this demand shall release the seaman from his contract and he shall be entitled to full payment of wages earned. And when the voyage is ended every such seaman shall be entitled to the remainder of the wages which shall be then due him, as provided in the preceding section: Provided further, That notwithstanding any release signed by any seaman under section 644 any court having jurisdiction may upon good cause shown set aside such release and take such action as justice shall require: And provided further, That this section shall apply to seamen on foreign vessels while in harbors of the United States, and the courts of the United States shall be open to such seamen for its enforcement."

It is well settled that the protection of this statute extends to foreign seamen on a foreign vessel within a port of the United States and that it secures to them the payment of their wages upon the completion of the voyage ending in such port.

Patterson v. Bark Eudora, 190 U.S. 169, 23 S.Ct. 821, 47 L.Ed. 1002; Strathearn S. S. Co. v. Dillon, 252 U.S. 348, 40 S.Ct. 350, 64 L.Ed. 607; The Sonderberg, 4 Cir., 47 F.2d 723.

We come, then, to the second and principal question, which is whether the war bonus sued for constitutes wages of the seamen within the meaning of the statute. That bonus was provided for in a contract between the seamen and the master of the vessel when they signed on at Philadelphia, on January 8, 1940, "for a voyage or more and return to the United States". Under this contract they were to receive "Greek wages, plus war bonus according to Greek law". The bonus was 80% of the basic wage, regardless of where the vessel went, plus two pounds ten shillings per day while actually in belligerent areas.

The bonus provision of the Greek law is contained in a Greek departmental order, and was arrived at by conferences between the Under Secretary of Marine of Greece and representatives of various seamen's unions. In addition to providing the amount of the bonus, it provides that the captain of the vessel shall remit the bonus to the Bank of Greece immediately upon the conclusion of the voyage. The amount remitted is to be payable only to some one in Greece, but, as we understand the order, it may be deposited in a savings bank or a postal savings account in that country for the benefit of the absent seamen. In the case at bar, the master of the vessel paid the men their basic wages upon arrival of the vessel in Dublin, Ireland; and the so-called "war-bonus" earned up to that time was sent to the Bank of Greece to be paid to certain individuals named by the men, and is not here involved. The vessel then returned to the port of Baltimore, where the voyage for which libelants had signed was at an end. They were paid their basic wages, but the "war bonus" earned on their return voyage was withheld to be sent to the Bank of Greece. It is this "war bonus" earned on the second leg of the voyage which is here involved.

There can be no question but that the so-called "war bonus" was additional wages for extra-hazardous service. It was awarded as the result of a demand for increased wages, and was paid for services rendered and for nothing else. To call a portion of such wages a "war bonus" does not alter its essential character. La Juett v. Coty Mach. Co., 153 Misc. 410, 275 N.Y.S. 822; 5

Words and Phrases, Permanent Edition, 670. Wages is "the compensation agreed upon by a master to be paid to a servant, or any other person hired to do work or business for him. In maritime law. The compensation allowed to seamen for their services on board a vessel during a voyage". Black's Law Dictionary 1230. See also 67 C.J. 284; 56 C.J. 961 et seq.; The Magnetic, D.C., 293 F. 94; Ryan v. Hook, 34 Hun, N.Y., 185, 191; Cookes v. Lymperis, 178 Mich. 299, 144 N.W. 514; Phoenix Iron Co. v. Roanoke Bridge Co., 169 N.C. 512, 86 S.E. 184. The compensation agreed upon was for the ordinary services which as seamen libelants were expected to render. There was no element of special compensation for services beyond the line of duty.

A bonus is "a sum paid for services, or upon a consideration in addition to or in excess of that which would ordinarily be given". Kenicott v. Wayne County, 16 Wall. 452, 471, 21 L.Ed. 319; George A. Fuller Co. v. Brown, 4 Cir., 15 F.2d 672, 676; Noel v. Parrott, 4 Cir., 15 F.2d 669, 671; Bass v. Hawley, 5 Cir., 62 F.2d 721. The term implies "something given in addition to what is ordinarily received by, or strictly due to, the recipient". Pugh v. Scarboro, 200 N.C. 59, 156 S.E. 149, 150. If, therefore, there is no such element of additional compensation, but the amount is merely what the parties expected to be paid for services rendered, it is a misnomer to call it a bonus. Thus, in La Juett v. Coty Mach. Co., supra, 153 Misc. 410, 275 N.Y.S. 822, it was held that an agreement to pay $12 per week as wages and the difference between that sum and former wages as a bonus when the financial condition of the employer would permit, did not prevent the whole amount being considered as wages. And, in Ciarla v. Solvay Process Co., 184 App.Div. 629, 172 N.Y.S. 426, 428, it was held that bonuses to encourage efficiency and economy and to retain the service of employees, based on a percentage of wages, must be included in calculating wages under a workmen's compensation act, "'wages' means the money rate at which the service rendered is recompensed under the contract of hiring * * including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer". Even the tips received by a Pullman car porter, where they are understood by the porter and the company to be a part of his "wages", can be considered as such in determining the compensation to which he is entitled for injuries. Bryant v. Pullman Company, 188

App.Div. 311, 177 N.Y.S. 488. And tips received by a taxi driver, where taken into consideration in fixing wages, should be added to regular wages in determining the average weekly wage as the basis of an award. Sloat v. Rochester Taxicab Co., 177 App.Div. 57, 163 N.Y.S. 904.

Whatever may be thought of the soundness of the rule which assimilates bonus payments made by others to wages paid by the employer, there can be no question but that payments made under contract by the employer himself should be thus treated. As said in Johnson v. Fuller & Johnson Mfg. Co., 183 Wis. 68, 197 N.W. 241, 245, "where an employer pays a bonus he has in view a benefit accruing to him, consisting of an inducement to continuous service and of loyalty on the part of the employee. The employee does not receive the bonus as a gift, as the literal meaning of the term would indicate, but, on the contrary, as a part of his wage." And a "bonus" definitely promised as additional compensation has been held to be wages and within the protection of the statute of South Carolina giving a lien for wages. Robertson v. Wise, 153 S.C. 459, 151 S.E. 87, 88. Also one who is promised a bonus for continuous work for a year in addition to regular wages, is entitled to recover a proportionate part of the bonus promised, upon wrongful discharge during the year. Roberts v. Mays Mills, 184 N.C. 406, 114 S.E. 530, 28 A.L.R. 338. The rule is thus stated in Labatt's Master and Servant, 2d Ed., vol. 2, p. 1323: "In some contracts it is stipulated, either absolutely or conditionally, that a sum designated as a gift, gratuity, or bonus shall be payable at a certain date. Such a sum is in effect a part of the stipulated remuneration; and when the specified period has expired, the right to recover it at once accrues to the servant, provided the agreement is valid, and the specified condition, if there be one, has been fulfilled."

The case of The Jacob Luckenbach, D.C., 36 F.2d 381, relied upon by appellee, is distinguishable in that what was offered the seamen in that case was a lump-sum reward of $100 each, in addition to wages, to bring a vessel, which had been stranded, into a port of this country, and the question involved was whether the double-wage provision for failure to pay promptly was applicable to this sum as well as to wages. The holding to the contrary furnishes no support whatever for the position that an increase in the compensation of seamen for services rendered amid the dangers of war is not wages within any fair meaning of the term, or that liability therefor under the statutes of the United States relating to seamen's wages can be avoided by calling it a "war bonus". The $100 promised to each of the seamen in the Luckenbach case was properly held to be distinguishable from wages for the purpose of the double-wage provision of the statute. The "war bonus" here involved was not something paid or promised in excess of what would ordinarily be given; but was agreed upon as the ordinary pay for the dangerous service in which libelants were engaged.

On the third question, we think there can be no doubt but that the agreement that a part of the wages of libelants should, under the guise of "war bonus", be deposited in the Bank of Greece instead of being paid to libelants themselves, was in contravention of the provision of the statute requiring that at the end of the voyage seamen shall be paid the remainder of the wages due them. It will be noted that wages earned on the first leg of the voyage are not in dispute. It may well be that the remittance made by the master, while in a foreign port, to the Bank of Greece of the wages earned up to that time should be sustained if legal where made. Sandberg v. McDonald, 248 U.S. 185, 39 S.Ct. 84, 63 L.Ed. 200; Neilson v. Rhine Shipping Co., 248 U.S. 205, 39 S. Ct. 89, 63 L.Ed. 208. The wages earned on the last leg of the voyage, however, are in a different situation. The voyage had ended in a port of the United States. The law of this country entitled the seamen to payment of the remainder due them as wages. The vessel by entering the port became subject to that law, and no contract in contravention thereof could be given effect. Patterson v. Bark Eudora, 190 U.S. 169, 23 S.Ct. 821, 47 L.Ed. 1002.

Directly in point is Strathearn S. S. Co. v. Dillon, supra, 252 U.S. 348, 40 S.Ct. 350, 64 L.Ed. 607, where a contract of foreign seamen with a foreign vessel limited their right to payment of wages until the end of the voyage. It was held that under the statute the seamen were entitled to payment of half wages while in an American port, notwithstanding the provision of the contract of employment to the contrary. It is true that the court adverted to the express language of the statute to that effect in the provision relating to the right

to demand half wages; but it is elementary that a contract contrary to the requirements of a statute is void whether expressly made so by the statute or not.

 In the case at bar, it would seem clear that the agreement made in the United States in advance of the performance of services that a part of the wages to be earned should be sent to a bank in a foreign country, was an allotment of wages void under 46 U.S.C.A. § 599. We need not decide this point, however, since the withholding of wages at the end of the voyage was clearly contrary to the law of this country as embodied in 46 U.S.C.A. § 597; and the fact that the withholding was pursuant to a contract to that effect, valid under the law of a foreign country, is absolutely immaterial. A contract contrary to the public policy of the forum will not be enforced, particularly if that public policy is evidenced by a statute which the contract contravenes. 5 R.C.L. 944; Kennett v. Chambers, 14 How. 38, 52, 14 L. Ed. 316; Oscanyan v. Arms Co., 103 U.S. 261, 26 L.Ed. 539; Cuba R. Co. v. Crosby, 222 U.S. 473, 478, 32 S.Ct. 132, 56 L.Ed. 274, 38 L.R.A.,N.S., 40; Bothwell v. Buckbee-Mears Co., 275 U.S. 274, 278, 48 S.Ct. 124, 72 L.Ed. 277; Grosmon v. Union Trust Co., 5 Cir., 228 F. 610, 612, Ann.Cas.1917B, 613; Parker v. Moore, 4 Cir., 115 F. 799, 802; Northern Pac. R. Co. v. Kempton, 9 Cir., 138 F. 992, 998, 999.

Once the "war bonus" is held to be a part of the wages due libelants, there can be no controversy, we think, as to the duty of the courts of the United States to take jurisdiction of the libel. The statute above quoted, 46 U.S.C.A. § 597, expressly provides that, when the voyage is ended, the seaman "shall be entitled to the remainder of the wages which shall be then due him"; that the statute shall apply to "seamen on foreign vessels while in harbors of the United States"; and that "the courts of the United States shall be open to such seamen for its enforcement". As pointed out in Strathearn S. S. Co. v. Dillon, supra, 252 U.S. 348, 354, 40 S.Ct. 350, 351, 64 L.Ed. 607: "The language applies to all seamen on vessels of the United States, and the second proviso of the section as it now reads makes it applicable to seamen on foreign vessels while in harbors of the United States. The proviso does not stop there, for it contains the express provision that the courts of the United States shall be open to seamen on foreign vessels for its enforcement. The latter provision is of the utmost importance in determining the proper construction of this section of the act. It manifests the purpose of Congress to give the benefit of the act to seamen on foreign vessels, and to open the doors of the federal courts to foreign seamen. No such provision was necessary as to American seamen for they had the right independently of this statute to seek redress in the courts of the United States, and if it were the intention of Congress to limit the provision of the act to American seamen, this feature would have been wholly superfluous."

After pointing out that the protection of American seamen demands that these provisions of the law be enforced with respect to foreign seamen as well, since otherwise foreign seamen would have an advantage in obtaining employment, the court in Strathearn S. S. Co. v. Dillon, supra, went on to say, 252 U.S. page 355, 40 S.Ct. page 352, 64 L.Ed. 607, "But, taking the provisions of the act as the same are written, we think it plain that it manifests the purpose of Congress to place American and foreign seamen on an equality of right in so far as the privileges of this section are concerned, with equal opportunity to resort to the courts of the United States for the enforcement of the act." Foreign seamen would manifestly not be placed on an equality of right with American seamen "with equal opportunity to resort to the courts of the United States for the enforcement of the act", if the courts were at liberty in their discretion to decline jurisdiction of such suits instituted by foreign seamen. And to this we may add that, in the language of Chief Justice Marshall, "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." Cohens v. Virginia, 6 Wheat. 264, 404, 5 L.Ed. 257.

 Nothing to the contrary can be worked out of the Greek treaty. Art. 12 of the Convention of 1902, 33 Stat. 2122, gave to consuls-general, consuls, etc., exclusive jurisdiction of wage controversies on ships of their nation; but, as pointed out by the learned judge below, the provisions of that article, in so far as they were inconsistent with the Act of 1915, were abrogated in 1916 by agreement with the Greek government. And, even in the absence of the abrogating agreement, it is well settled that the provisions of a statute supersede those of a prior treaty inconsistent therewith. The Cherokee Tobacco, 11 Wall. 616, 20 L.

Ed. 227; Head Money Cases (Edye v. Robertson), 112 U.S. 580, 597, 599, 5 S.Ct. 247, 28 L.Ed. 798; Whitney v. Robertson, 124 U.S. 190, 195, 8 S.Ct. 456, 31 L.Ed. 386. It is clear from his opinion that the judge below declined jurisdiction merely because he had reached the conclusion that the "war bonus" was not wages within the meaning of the statute, and that, had he reached the contrary conclusion, he would have assumed jurisdiction.

We have considered the decisions in The Cambitsis, D.C., 14 F.2d 236; The Prince Pavle, D.C., 32 F.Supp. 5; Athanosios Veziris v. S. S. Taxiarchis[1] and The Estrella, 3 Cir., 102 F.2d 736. We are not convinced by the reasoning in any of them, however, that a court of the United States is justified in declining jurisdiction of a suit by a foreign seaman for wages due him at the end of a voyage which terminates in a port of the United States. The mandate of the statute seems clear; and it is worthy of note that the present Senior Judge of the Third Circuit filed a vigorous dissent from the decision in the case last cited.

For the reasons stated, the decree appealed from will be reversed.

Reversed.

[1] No opinion for publication.