## GLANDZIS et al. v. CALLINICOS.

### A. 124–13.

District Court, S. D. New York.

Nov. 17, 1942.

Messrs. Melton, Lebovici & Arkin, of New York City (Herbert Lebovici, of New York City, of counsel), for libellants.

Frederick H. Cunningham, of New York City, for respondent.

CLANCY, District Judge.

The seamen on the Eleni signed no formal articles. Their entry into the ship's service and their departure therefrom were registered on what was called, during the trial, a ship's "personnel list." So their rights to wages must be found in the contracts made by their unions in their behalf and promulgated by the Greek Government. We have a certified copy of the agreement of August 5th made at London between the committee of ship owners and the committees representing the several Greek seamen's unions. Libel-

lants do not claim that this agreement has been breached in any respect. Added to it is a certified copy of the ship owners' supplementary statement on the construction of which their libel stands. The statement in the Greek language is on a separate page but whether it was so in the original does not appear. In the Greek typed copy the signatures of both the committee representing the shippers and of the port captain, one Courbellis, who signed, appear typed. Courbellis did not merely approve it as libellants say. No legend appears to limit the effect of his signature in any way. There is an undecipherable written signature under the legend "Certified copy. New York, 9/22/1941. Consular Port Officer:" This signature was not identified on the trial and appears to be that of the certifying officer. The four members of the ship owners' committee are the same four who, on the same day and in the same city— London, signed for the owners the agreement with the representatives of the maritime unions. No reason appears why the supplementary statement was separately signed, and by a different party as obligee, or why it was not embodied in the main contract and signed by the same parties if it was either a contract with the unions or intended to be a part of the contract with them. Finally the gist of the statement is contained in the sentence: "State that they agree to deposit with the Greek Government." This is the only phraseology in the entire statement which expresses either an offer, an agreement or even a contact between two persons. The provision for the deposit of the money in the bank is impersonal and may be fulfilled to the letter without notice to any individual seaman but a deposit cannot be made with the Greek Government without their knowing it. The right to select a depositary, other than the named one, by the seamen's trade union merely makes the union an arbiter of one feature of performance, not a party to the agreement. It might be thought that the phrase "with the Greek Government" would more readily belong after the word "agree" in the quoted phrase. But the certified translation is as we have stated it. We think all these features combined indicate as a fact that the supplementary statement was an offer to the Greek Government and the fact that Courbellis, the port captain, signed the statement, together with the committee for the ship owners, confirms this conclusion. "Port captain" seems a modest title for a contracting officer of the Greek Government but he did sign it and no one else than the owners' committee did. No official of the Government signed the contract between the owners and the unions although it appears on its face that it was made at the office of Captain Alexandris of the Royal Navy, an attache of the Royal Embassy at London. We, therefore, hold that the supplementary statement was an offer to the Greek Government accepted by Courbellis and certainly accepted when the Greek Government promulgated it and constitutes a contract distinct from the agreement between owners and unions.

Respondent says it is merely a voluntary offer without any binding effect. No consideration appears moving to the ship owners and exhibit "C", an opinion of the legal adviser of the Greek Embassy, refers to it as an "act of grace." But in default of evidence of failure of consideration, we are unable to find it as a fact or conclude that the contract is invalid therefor and we will hold it binding. The seamen who are the beneficiaries, like the libellants here, may enforce it. Restatement of the Law of Contracts, §§ 135 and 138.

The bonus under such a contract is not a wage. In The Leonidas, 4 Cir., 116 F.2d 440, a sum of money described as a bonus and agreed upon between the seamen and the master at Philadelphia and provided in that agreement to be deposited in the Bank of Greece, was held to a wage and the contract to deposit it in the bank invalid because it was contrary to the public policy announced in 46 U.S.C.A. § 597. The court there cited many authorities from both case books and text books as well as the New York Workmen's Compensation Law, Consol.Laws, c. 67, § 2, par. 9, to sustain its definition of "wages" as the money rate fixed by the contract of employment and decided that the bonus claimed by the seaman there was a wage because it was agreed upon by master and man in the contract of hiring. We have already found that the supplementary statement and its acceptance by the Greek Government constituted a contract distinct from the contract between owners and seamen which fixed the terms of the contract of hire between the seamen of the Eleni and its master. It was shown in The Leonidas that monies paid by third persons in the nature of gratuities may be considered by the parties to the wage contract to be part of the workers' compensation and therefore, by assimilation to the contract of employment,

may become a wage. Sloat v. Rochester Taxicab Co., 177 App.Div. 57, 163 N.Y.S. 904; Bryant v. Pullman Co., 188 App.Div. 311, 177 N.Y.S. 488. Such amounts, it appears from those authorities, are assimilated to the hiring contract because they were in the contemplation of the contracting parties when their agreement was made. This was not the situation of the parties here. The inter-association agreement, in one of its preambles, stated the recognition by the parties to it of the need of simplification and readjustment of the then existing system of wage payments "so that Greek seamen, when the war is over, may have at their disposal the requisite savings for the relief of their ruined families and of their own selves." But we cannot assume that this need was not to be met by the wage payments and overtime, sick, unemployment and maintenance benefits therein provided and we are unable to conclude from a statement of the need that the parties had in mind any other promise of the owners than those stated in the inter-association agreement. The "supplementary" statement was "appended" to the inter-association agreement but neither word reveals much. "Appended" might well indicate it was later in execution than the agreement but this is not necessarily so. But the two agreements are distinct and by an ordinary rule of construction we must hold the inter-association written agreement complete in itself. We may not assume that the masters and union representatives, when they signed it, were dealing with anything but its stated contents and in them we find nothing that indicates any understanding or intent to include by reference or otherwise any of the matters found in the supplementary statement. And we have no evidence whatever to point to such an understanding or intent. We conclude, therefore, that nothing that appears either in the inter-association agreement or the supplementary statement is sufficient ground for a determination that the parties to the inter-association agreement had any thought whatever of the matters stated in the supplementary statement and it follows from this that there was no assimilation to the inter-association agreement of the bonus claimed by the seamen. Performance of his work contract incidentally makes him a beneficiary of the owners' contract. The required deposit is an additional emolument but that emolument is not derived from his employment contract. The right to enforce the deposit is additional to his wage and attaches to the deposit required by the agreement but that right is not included in the word "wages" in the Statute. 46 U.S.C.A. § 597. The Statute itself says: "All stipulations in the contract to the contrary shall be void." This can mean only the contract between master and man and confines the meaning of "wages" to such contract.

But the libel may well be thought to state a cause of action for the enforcement of the libellants' rights under the statement. To decide what those rights are, construction of the agreement is necessary. There was no evidence submitted at the trial on the issue of construction and, therefore, the sense of the agreement must be determined on its face. We note that although the method of deposit of the bonus is provided for in some detail—who is to make it, the bank named, an account appropriate to each seaman and the issuance of separate bank books, yet no provision is made for delivery of the bank books to the seamen. When we consider that they may be anywhere on the seven seas when the bonus has been earned and further consider the requirement that it is the owners or master who must make the successive deposits, it does not appear at all clear to us that the bank book was intended to be delivered to the individual seaman but would constitute a record of the owners' performance and of the seaman's interest which the Greek Government might well retain. We understand "compulsory savings" to mean a plan whereby a Government has the use of the money involved during the war and the corresponding obligation to pay the owner of the money after the war. But we do not believe that definition so sufficiently notorious at this time that it necessarily attaches to that phrase in the statement. The words themselves, standing alone, ordinarily do not bear such a meaning. A contradiction might seem to exist between deposit with the Greek Government and the later deposit with the bank but there is none if it be concluded that the Government has imposed on it the duty to see that the agreement is kept by the owners (Restatement of the Law of Contracts, § 135b) and the parties intended the evidence of the deposit—the bank book—to be deposited with the Government. We, therefore, find that the contract requires the deposit of the stated amounts in a London bank in an individual account for each seaman as earned by him, the deposit to

be evidenced by a separate bank book for each seaman which shall be delivered to the Greek Government or authorities at London. It may well be that the libellants' rights as beneficiaries of the agreement between the owners and the Greek Government have been recognized. Exhibits "2 a" and "a b" indicate that the respondent has discharged its duty to the libellants by making deposits for them. There is no evidence that it has not done so.

The libel is dismissed.