Robert WILLIAMS, (82–1276), Plaintiff-Appellee,

Leslie Dean Milton, (82–1852), Plaintiff-Appellee,

v.

GREAT LAKES DREDGE AND DOCK COMPANY, Defendant-Appellant.

Nos. 82–1276, 82–1852.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 29, 1983.

Decided Jan. 27, 1984.

* The Honorable Bernard T. Moynahan, Jr., Chief District Judge for the Eastern District of Kentucky, sitting by designation.

Richard A. Dietz argued, Foster, Meadows & Ballard, Detroit, Mich., for Great Lakes Dredge and Dock Co.

Gary William Baun argued, Detroit, Mich., for Milton.

Leonard C. Jaques, Gary William Baun, argued, Detroit, Mich., for Williams.

Before MARTIN and JONES, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

In this admiralty case, Great Lakes Dredge and Dock Company appeals the district court's decision to award two of its former employees, Robert Williams and Leslie Milton, $123,968.40 and $124,366.68, respectively, pursuant to the penalty provisions of 46 U.S.C. § 596. Great Lakes contends that the money at issue was not "wages" for purposes of section 596, that it had "sufficient cause" to withhold payment, and that the statute was not intended to apply to persons in plaintiffs' position. We disagree with Great Lakes on all three points and affirm the decision of the trial judge.

Robert Williams and Leslie Milton were hired by Great Lakes in 1977 to work as seamen in a dredging project in the Saudi Arabian port of Ju'Aymah. Both men signed similar employment agreements, which committed them to work for twelve months or until the completion of the project, whichever came first. Article VIII of the agreement divided their "compensation for work performed" into three categories: (a) a base rate of $940.50/wk., (b) a travel allowance of $184.68/wk., and (c) a completion bonus of $94.05/wk. Part (a) of the compensation package was to be paid to the employee at weekly intervals over the course of his entire employment. Part (b) was accumulated in a separate account and was used to pay for any trips taken by the employee during the course of the project. A separate part of the agreement guaranteed each employee initial airfare to Saudi Arabia and final return airfare from Saudi Arabia. This travel was not to be charged to the travel allowance. Any surplus remaining in the employee's travel fund at the termination of the agreement was to be paid in full to that employee. Part (c) was also kept in escrow for each employee and only paid out upon satisfactory completion of the agreement. Milton's agreement also stated that "the employee's pay under (a), (b) and (c) above will start two days before leaving his United States residence for Saudi Arabia" and would end "two days after leaving Saudi Arabia."

On November 22, 1977, both Williams and Milton satisfactorily completed their work on the Ju'Aymah project and were eventually paid all sums due and owing under the contract. (The record established that the travel allowance surplus and the completion bonus were not paid until one month later, but no reason was given for the delay.) Instead of returning to the United States, however, the plaintiffs agreed to work on a second dredging project at Ruwais, Abu Dhabi. There was an oral agreement that the terms of the Ju'Aymah contract would also govern the Ruwais project. The Ruwais project was completed in one month. At its conclusion, the plaintiffs were paid the money owed to them under part (a) of the compensation agreement but not under parts (b) and (c)—the travel allowance and the completion bonus.

Subsequently, Williams and Milton began work on yet another project, this one at Mina Jebel Ali in Dubai. The plaintiffs were told that a new contract would be drawn up for the Dubai project but that they would continue to work under the old contract until the new one was ready. When presented with the new contract, plaintiffs were unhappy with its duration (18 months), its reduced travel allowance, and its requirement that they be willing to work anywhere in the Middle East. After efforts at renegotiation failed, they elected to quit work and return to the United States in February 1978.

The plaintiffs were never paid the money due and owing from the travel allowance surplus and the completion bonus for the Ruwais project despite assurances to that effect from the company. Eventually, they filed suit to recover their backpay plus penalty pursuant to 46 U.S.C. § 596. That statute requires that a shipowner who refuses to pay a seaman all his wages within four days of his discharge "shall pay the seaman a sum equal to two days pay for each and every day during which payment is delayed beyond [the required period.]" At trial, the district judge found that Williams and Milton were owed $716 and $1,114, respectively, in backpay. Under the

penalty provisions of section 596, however, the trial judge found that the actual amount owed to each employee had mushroomed to approximately $125,000.

On appeal, Great Lakes first argues that neither the travel allowance nor the completion bonus called for in the employment agreement was "wages" within the meaning of 46 U.S.C. § 596. Beginning with the travel allowance, Great Lakes cites two cases, *Korinis v. Sealand Services, Inc.*, 490 F.Supp. 418, 421 (S.D.N.Y.1980), and *Ladzinski v. Sperling Steamship & Trading Corp.*, 300 F.Supp. 947, 952 (S.D.N.Y.1969), for the proposition that transportation expenses are not subject to section 596. In *Korinis,* the plaintiff sought reimbursement for travel expenses incurred when he was flown from his ship to a mainland hospital for treatment of an ulcer. In *Ladzinski,* the plaintiff was trying to recover for transportation to his hometown from his port of discharge as called for in his employment contract.

■ Assuming that these plaintiffs were rightly denied section 596 damages these cases are not controlling because the travel allowance at issue here is really a part of the employee's compensation and not part of what would ordinarily be called transportation expenses. The travel allowance was listed under "compensation for services rendered." It was referred to in the employment agreement as part of the "employee's pay." It accrued on a weekly basis in a manner which had nothing to do with the actual travelling done by any employee. There was a separate provision in the employment agreement which provided for all essential travel, i.e., initial airfare to and final airfare from the work site in the Middle East. There was no requirement that employees use their travel allowance for any actual travel. Finally, and most importantly, each employee was entitled to receive in cash any unused surplus in the travel account at the completion of the agreement. In essence then, each employee had total control over the expenditure of the travel allowance, and, as such, it was identical to the other portions of the compensation package. Therefore, we believe the travel allowance was wages under section 596.

■ The argument that the completion bonus was not wages fares no better. Great Lakes cites only one case to support its claim that a bonus is not wages, *The Jacob Luckenbach* 36 F.2d 381, 385 (E.D.La. 1929). Even this decision, however, lends support to the plaintiffs' case. At issue in *Luckenbach* was a $100 bonus promised to sailors who agreed to complete a sea voyage in an unseaworthy vessel. In deciding that this bonus was not a part of the sailors' wages, the court defined wages as "the monthly payments designated in the articles." In this case, the completion bonus was a periodic payment much like the wages as defined in *Luckenbach*. Moreover, the bonus, like the travel allowance, was listed under "compensation for services performed" and was referred to as part of "the employee's pay." Finally, it appears that more recent case law has established that bonuses of whatever kind are wages for purposes of section 596. *See Glandzis v. Callinicos,* 140 F.2d 111 (2d Cir.1944); *Lakos v. Saliaris,* 116 F.2d 440, 442 (4th Cir.1940); *Kalantzis v. Mesai* 132 F.Supp. 745, 749 (E.D.Va.1955). Accordingly, we find that the completion bonus, like the travel allowance, was wages under section 596.

■ Great Lakes next argues that its failure to pay the plaintiffs all of their wages due was justified and therefore not covered by the statute. Section 596 provides that its provisions are applicable only when the failure to pay wages when due is "without sufficient cause." In *Collie v. Fergusson,* 281 U.S. 52, 55, 50 S.Ct. 189, 191, 74 L.Ed. 696 (1930), the Supreme Court held that a refusal to pay was without sufficient cause if it was "in some sense arbitrary or willful, or at least a failure not attributable to impossibility of payment." Unfortunately for Great Lakes, there is evidence in the record that the refusal to pay was "arbitrary or willful" and not caused by "impossibility of payment." William Gohagan, the man in charge of all Middle East operations for Great Lakes, testified that there was "a

lot of heat over there ... when [the plaintiffs] deserted the ship" and that the plaintiffs were not paid their travel allowance and completion bonus for the Ruwais project because "in the heat of the moment the decision was made not to pay it, although ... looking back on it and reviewing it, they completed that project and they deserved it." Based on this testimony, we hold that the trial judge was not clearly erroneous in finding that there was no sufficient cause for Great Lakes' failure to pay Williams and Milton all their wages due.

Finally Great Lakes argues that section 596 was never intended by Congress to apply to seamen in the plaintiffs' situation. Great Lakes notes that when this legislation was originally enacted, seamen were often treated little better than slaves. They worked under very hazardous conditions, they were subject to arbitrary and sometimes harsh discipline from their captain, and they could not quit their jobs and look elsewhere for employment if they grew unhappy with their situation. Given the circumstances, the Congress concluded that seamen were at least entitled to some assurance that their wages would be promptly paid at the conclusion of a voyage. Hence the need for section 596. Because modern seafaring conditions are nothing like those existing when this legislation was passed, especially as regards these particular plaintiffs, argues Great Lakes, section 596 should no longer be applicable.

We do not accept this argument. While it may be true that conditions have changed since this law was enacted, the statute still remains in effect. If the Congress wishes to repeal or modify the statute, it may do so. But we cannot change the statute on our own. As the Supreme Court recently stated in *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 576, 102 S.Ct. 3245, 3253, 73 L.Ed.2d 973, 984 (1982) (where it denied district courts the discretion to modify the length of the penalty period under section 596), "The remedy for any dissatisfaction with the results in particular cases lies with Congress and not this Court. Congress may amend the statute; we may not."

Great Lakes also contends that the plaintiffs in this case should be excluded from coverage under section 596 because they are in a situation analogous to various excepted groups. Another shipping law, 46 U.S.C. § 544, specifically exempts from section 596 all ships engaged in the coastwise trade, Great Lakes trade, and trade with Canada. Great Lakes argues that its dredging ships in the Middle East are operating under conditions just like those prevalent in the exempt categories and so should also be exempt from section 596. But "just like" is not good enough. Ships operating in the Middle East are simply not part of any exempt class listed in the statutes. It is well settled law that when a statute makes exceptions, it is assumed that, absent clear evidence of intent to the contrary, those exceptions are exclusive. *See Andrus v. Glover Construction Co.*, 446 U.S. 608, 616–17, 100 S.Ct. 1905, 1910–1911, 64 L.Ed.2d 548 (1980).

Accordingly, the decision of the district court is affirmed.